# LUXMANOR CITIZENS ASSOCIATION, INC. ET AL. *v*. BURKART ET AL.

[No. 32, September Term, 1972.]

*Decided November 8, 1972.*

The cause was argued before MURPHY, C. J., and BARNES, SINGLEY, SMITH and LEVINE, JJ.

*John J. Delaney,* with whom were *R. Robert Linowes* and *Linowes & Blocher* on the brief, for appellants.

*C. Edward Nicholson* for Drs. Manfred Kozuch and Armand Dumas, part of appellees. *H. Christopher Malone, Assistant County Attorney,* with whom were *Richard S. McKernon, County Attorney,* and *Alfred H. Carter, Deputy County Attorney,* on the brief, for Helen Burkart et al., constituting the County Board of Appeals for Montgomery County, other appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves an order of the Circuit Court for Montgomery County (Shearin, J.) dated December 23, 1971, dismissing the appeal of Luxmanor Citizens Association, Inc. and certain individuals, appellants here and below, from a decision of the County Board of Appeals

for Montgomery County (Board) by a vote of three to two, granting the application of Dr. Manfred Kozuch and Dr. Armand Dumas, two of the appellees, for a special exception to construct and operate a medical clinic at 11404 Old Georgetown Road (Lots 2, 3 and 4, Block B, Luxmanor Subdivision), North Bethesda, located in an R-R (Rural Residential) zone. Judge Shearin was of the opinion that the issues before the Board were fairly debatable so that the Board's decision was not arbitrary, unreasonable or capricious and would not be reversed by the lower court. We have concluded that he was correct in his opinion and we will affirm the order of December 23, 1971, dismissing the appellants' appeal from the Board's decision.

The subject property, 11404 Old Georgetown Road, consists of three lots in the Luxmanor Subdivision to be resubdivided into one lot. This one lot is a corner lot and, using approximate figures, has frontage of 380 feet on the west side of Old Georgetown Road and has a frontage of 125 feet on the north side of Roseland Drive. The lot is an irregular one on its north and west boundaries. The northern line is 195 feet in length and adjoins Lot No. 1. The westerly boundary abuts Lot No. 13 for approximately 90 feet, then proceeds in a southeasterly direction along Lot No. 5 for 170 feet and then in a southerly direction 130 feet to intersect the northern side of Roseland Drive. Old Georgetown Road (Maryland Route 187) is a six-lane, dual highway adjoining the subject property on the east. The north and south three lanes are separated by a median strip. No parking is permitted on this road. There is regular public transportation on this highway. Roseland Drive is approximately 25 feet wide. It is a county blacktop road, with no curb, gutter or sidewalk.

To the north of the subject property and west of Old Georgetown Road is the Washington Science Center, a church and a single-family subdivision in the R-R zone. To the south, on the east side of Old Georgetown Road is the Woodward High School. To the west and south of

the subject property are single-family dwellings also in an R-R zone.

Doctors Kozuch and Dumas, contract purchasers of the subject property, filed their petition for the special exception for the medical clinic use on October 9, 1970. At the hearing on December 17, 1970, Dr. Kozuch testified that the proposed medical clinic would contain eleven suites for eleven doctors. He mentioned the possibility of having fifteen doctors because some of the doctors "may have associates," but it was "not likely that they will be there at the same time." The tenants might have as many as three employees in addition to the doctor. Others might have only one employee. In his own dental practice, he had two employees; one, a full-time receptionist and nurse; the other, a part-time chair side assistant. He rarely sees more than one patient an hour. He had sought to find office space—as had Dr. Dumas—in Bethesda and surrounding area, without success, no such space being available.

Dr. Dumas testified that he is an orthodontist who sees one patient an hour until 3:00 P.M., after which he sees three patients (mostly children after school hours) an hour. He also employs a receptionist and a chair side assistant.

John H. Sullivan, Jr., AIA, a registered architect in Maryland, who practices his profession from his business office in Bethesda, testified in support of the petition for the special exception. He had prepared the site plan and designed the building for the proposed medical clinic. He stated that the total area of the subject property was 60,135 square feet. The proposed building is a "two-story building of residential character" compatible with the area and contains a total of 12,030 square feet gross area, with eleven practitioner suites. The upper floor comprises six suites containing 6,060 square feet; the lower floor, five suites containing 4,050 square feet, with an average of 900 square feet per suite. The total parking space required for the gross area is 12,030 square feet. The Montgomery County Zoning Ordinance requires

parking spaces for 60 automobiles, and parking space for that number of cars is provided in the plan. There are provisions in the zoning ordinance for adjustment in the number of required spaces if the spaces are landscaped (a reduction of 10%) and for a reduction of 10% for compact automobiles from the normally required size of 9 feet by 20 feet to 9 feet by 14 feet. All 60 spaces are of normal size, except 6 spaces in back of the building, which are 9 feet by 15 feet. Mr. Sullivan recommended that two spaces be landscaped which, if the Board approved, would reduce the 60 parking spaces to 58 spaces.

The staff members would park primarily in the rear of the clinic. The building would primarily face toward Old Georgetown Road with a 25-foot roadway running from that road into the property near the south side of the building. There is also an 85-foot road giving ingress and egress from the subject property to Old Georgetown Road located approximately 50 feet north of the north side of Roseland Drive. The patients would park primarily to the south of the building and would drive from the subject property by way of the roadway nearest Roseland Drive. A 5-foot high stockade fence is around the yard of the subject property facing Roseland Drive and the abutting lot owner to the west to a point approximately one-half of the north property line. This fence is required by the zoning ordinance primarily to screen the parking areas.

The site is heavily wooded and it is contemplated that the majority of the present growth would remain. In addition, there would be minor landscape lighting two or three feet high of a contemporary nature, primarily for low ground cover illumination in the evening. This lighting is "very handsome . . . very low key lighting" and "will never be objectionable to adjacent property owners" in that it "has no intensity, is not high, not in a distinct fashion."

There will be only one low, well-designed sign at the front of Old Georgetown Road probably reading "Manor Medical Building" for identification of the property by

motorists. The names of the physicians and dentists will not appear on the sign.

The zoning ordinance requires a minimum of 40,000 square feet for a medical clinic, the site contains 60,135 square feet; the required minimum frontage is 200 feet, the site has approximately 380 feet on Old Georgetown Road and approximately 125 feet on Roseland Drive; the required setback for the building is at least 40 feet and the proposed building meets this requirement; the maximum permitted height of the building is 50 feet, the proposed building is only 27 feet 4 inches above the curb line of Old Georgetown Road. No parking spaces are within the front, side and rear yard setbacks required in the R-R zone.

The building—designed in a residential fashion—will be heated and cooled the year round. Any noise factor from a condensing unit—located adjacent to the building pointed north and screened by a masonry wall and planting—would be minimal. Being only two stories high, there will be no elevator. Provision has been made for trash storage in the lower level of the building next to the mechanical equipment area and trash would only be placed outside on trash collection days.

Mr. Sullivan was of the opinion that the adjoining residents were adequately protected from glare and noise; that the planting and fence adequately screened automobile traffic from the adjoining residences; that there was adequate provision for parking; and, that the proposed medical clinic building fitted that "degree of compatibility which this Board seeks to achieve in any type special exception."

The final witness for the petitioners was Page Hopkins, a consulting engineer, with offices in Silver Spring. His "specialty" is land use, traffic engineering and zoning. Mr. Hopkins has a Bachelor of Science degree and is registered as a professional engineer in Maryland, Florida, Virginia and Rhode Island. His qualifications as an expert were not challenged. He testified that he had familiarized himself with the present proposal. He in-

dicated that it would be necessary to resubdivide the three lots into one lot having exactly the same exterior dimension. He was of the opinion that the proposal would not adversely affect the health and safety of residents and workers in the area and would not overburden the existing public services such as water, sanitary sewer, public roads, storm drainage and other public improvements. He testified at some length and in detail in regard to the storm water situation. He indicated that in his opinion if the subject property had a runoff factor of .35 at the time of concentration, it would generate 2.782 cubic feet of water in five minutes. Using a runoff factor of .25 and time of concentration of five minutes, there was a total of one-half of a cubic foot of water for the green area so that there would be a runoff of 3.28 cubic feet per second, or .1 of a cubic foot more than is going across the property at the present time. To avoid any substantial concentration of water in one particular location, it is proposed to use bumper blocks pinned into the asphalt so that the water would naturally flow from the parking areas and be directed over a larger area.

Mr. Hopkins was of the opinion that the proposal would not tend to change the character of the general neighborhood or adversely affect the use or the development of adjacent properties. He pointed out that a medical clinic is a permitted use in the R-R zone and that the building is residential in character and completely screened from adjoining property owners. The parking is also generally screened from the adjoining property, being in some regards beyond that required by the zoning ordinance.

In regard to traffic, Mr. Hopkins had conducted a traffic study and concluded that there would be no traffic problem. His traffic survey indicated that on December 11, 1970, between 4:30 and 5:30 P.M.—the peak hour— he counted on Old Georgetown Road 1,490 vehicles northbound per hour and 1,736 vehicles southbound. Fourteen vehicles left Roseland Drive and entered Old Georgetown Road and three vehicles left Old Georgetown Road and

entered Roseland Drive. The designed capacity of Old Georgetown Road, according to the State Roads Commission, was for 3,300 vehicles per hour. He reached the following conclusion:

"Combining all of these figures with the design data of the State Roads Commission for this three-lane or six-lane divided highway, Georgetown Road, which has a design capacity of 3300 vehicles per hour, the southbound lane is now operating at 52.6 percent of its capacity and using the generation figures that I have set forth, during the peak hour there would be 60 trips generated southbound onto Georgetown Road so that is the only way you can exit the property.

"That would increase the vehicular hourly count by 60, and would increase the percentage of design capacity to 54.4 percent. Which represents an increase in design capacity of 1.8 percent. Or it represents 3.5 percent of the traffic presently using the road during the peak hour in the southbound direction.

"Northbound we counted 1490 vehicles. Based on a direction of traffic which would be generated by this facility we said that 20 percent of the people would come from the area to the west, that is the Tilden Lane entrance. Forty percent would come southbound on Old Georgetown Road and 40 percent northbound. We would then generate 48 additional trips northbound on Georgetown Road, increasing its operating percentage from 45.1 at the present time to 46.6 percent. Or representing an increase of the actual number of vehicles using the road today of 3.2 percent.

"As I stated in my traffic count, there were 14 vehicles that went from Georgetown Road into Roseland Lane. That road has a capacity

of approximately 900 vehicles per hour; 14 vehicles represents 1.6 percent of its design capacity."

Summarizing, Mr. Hopkins stated:

"In summation, when we increase the traffic on Old Georgetown Road in the neighborhood of 2 percent and the traffic on Roseland Lane by only 2.9 percent of its designed capacity, we certainly have not hurt the neighborhood from the standpoint of traffic generation."

Mr. Hopkins, in order to verify his opinion in regard to the adequacy of parking, compared the experiences of other medical clinics in Montgomery County. At Doctors Park—for which he was a consulting engineer—he estimated that the vacancy ratio of parking spaces during any given hour of the day is between 35 and 50%. University Medical Clinic on University Lane, two blocks south of Dennis Avenue—which he visits once a week—has a parking vacancy ratio of approximately 35%. He stated, "It is very seldom when I can't park right in front of the door." The larger Forest Glen Clinic at the northeast corner of Georgia Avenue and Forest Glen Road had an estimated parking vacancy ratio of 25%. In summary, he stated:

"What I am leading up to is including the staff, people, overlapping patients, the ordinance of Montgomery County regulating a medical clinic is more than adequate in its provision for parking. That has been my experience, both personal observation and as a professional traffic engineer."

The neighboring property owners who protested against the granting of the special exception were represented by counsel at the hearing. Only one of the protestants, William McQuilkin, 6004 Roseland Lane—a lay witness—testified. Although he indicated his apprehension in regard to increased traffic and flow of storm

water, there was nothing in his testimony that tended to refute the testimony of the petitioners' expert witnesses.

Section 111-35 of the zoning ordinance provides that the applicant for a special exception shall have the burden of proof to establish the required criteria for the granting of a special exception and that the criteria are:

"(1) The proposed use does not affect adversely the General Plan for the physical development of the District, as embodied in this Ordinance and in any Master Plan or portion thereof adopted by the Commission; and

"(2) The proposed use at the location selected will not:

"(a) adversely affect the health and safety of residents or workers in the area;

"(b) overburden existing public services, including water, sanitary sewer, public roads, storm drainage, and other public improvements;

"(c) be detrimental to the use or development of adjacent properties or the general neighborhood; nor change the character of the general neighborhood in which the use is proposed considering service required, at the time of the application, population density, character, and number of similar uses; . . . ."

In addition, Section 111-36 f provides:

"f. In addition to the findings required in Sections 111-35 and 111-37 the following special exceptions may be granted when the Board or Director, as the case may be, finds from a preponderance of the evidence of record that for the public convenience and service a need exists for the proposed use for service to the population in the general neighborhood considering the present availability of such uses to that neighborhood."

* * *

"(5) Medical clinics."

The zoning ordinance also provides in regard to "Medical and Dental Clinics":

"(1) In any Residental Zone except R-E and R-H a medical or dental clinic upon a finding by the Board that such use will not constitute a nuisance because of traffic, noise or physical activity and that such use will not affect adversely the present character or future development of the surrounding residential community, subject to the following specific conditions:

"(a) Minimum Area—40,000 square feet.

"(b) Minimum Frontage—200 feet.

"(c) Minimum Setback—40 feet from all property lines.

"(d) Maximum Building Height—as specified in zone.

"(e) Maximum Building Coverage—15 percent."

As we have observed, the zoning ordinance also provides for parking spaces, screening and setbacks, with which the plans for the proposed medical clinic conform.

On March 2, 1971, the Board, by a three to two vote— approved the granting of the petition for the special exception for a medical clinic upon certain conditions. In the majority opinion of the Board, after reviewing the testimony in some detail, it was stated:

"Upon consideration of the testimony and exhibits of record, and after considering the opponents' objections, the Board finds that, subject to conditions imposed herein, the proposed medical and dental clinic will not constitute a nuisance because of traffic, noise or physical activity, and that the proposed use will not affect adversely the present character or future development of the surrounding residential community, and that the site conforms to the Ordi-

nance requirements for the area, frontage, setbacks, building height and building coverage. The entrances and exits are onto an arterial street, Old Georgetown Road.

"Additionally, the Board finds that the proposed medical and dental clinic will not: (a) adversely affect the health and safety of residents or workers in the area; (b) overburden existing public services available to serve the site; (c) and that for the public convenience and service a need exists for the proposed clinic for service to the population in the general neighborhood considering the present availability of such uses to that neighborhood.

"Accordingly, the requested Special Exception is *granted to the petitioners* only, and subject to the following conditions:

"1. Any change in ownership shall be subject to a new Special Exception.

"2. Final plans for the design of the building, the parking lot, the drainage, and the landscape plan shall be subject to the approval of the Building Inspector and the Department of Public Works before a building permit is issued. Plantings used for screening shall be of living evergreens, at least four feet in height at time of planting.

"3. A minimum number of sixty (60) parking spaces shall be provided.

"4. There shall be no incinerators provided for any burning of trash.

"5. The proposed medical and dental clinic shall be constructed in conformance with the exhibits and testimony of record.

"6. Adequate lighting shall be provided when the parking lot is used after dark, lighting standards to be no higher than

ten feet, and said lighting plan shall be approved by the Building Inspector.

"7. The number of doctors leasing space in the building shall not exceed 15.

"8. The parking lot shall be maintained in good condition at all times. No litter or debris shall be allowed to accumulate. Trees and/or shrubbery shall be replaced when necessary.

"9. The subject property shall be resubdivided into one lot.

"10. The subject Special Exception granted herein shall be subject to public water and sewer service."

In the dissenting opinion of two members of the Board, it was indicated that they were of the opinion that (1) the petitioners had failed to carry the burden of establishing the criteria set out in the ordinance for the granting of a special exception; (2) there would be a traffic hazard; and, (3) the proposed use would create noise and activity inconsistent with the residential character of the neighborhood.

Upon appeal to the Circuit Court for Montgomery County, Judge Shearin, as we have indicated, was of the opinion that the issues before the Board were fairly debatable and that its decision should be affirmed.

The appellants raise three questions before us:

(1) The grant of the special exception by a three to two vote of the members of the Board was made void by the amendment of the zoning ordinance effective after the Board's decision but before the decision on appeal to the circuit court requiring four affirmative votes for the granting of a special exception.

(2) The proposal locates parking spaces only 12 feet from an adjacent rear yard, rather than the 30 feet required in the R-R zone.

(3) The decision of the Board was unsupported by the evidence and was arbitrary and capricious.

(1)

The Montgomery County Council on September 21, 1971, adopted Ordinance No. 7-9 amending Section 111-30 (d) of the zoning ordinance to require the affirmative vote of four members of the Board—rather than a majority vote as formerly—for the grant of a special exception. It was provided that this amendatory ordinance should be "effective immediately." The appellants admit that Judge Shearin was not advised of this amendment prior to the filing of his opinion and order dismissing the appellants' appeal on December 23, 1971. The record indicates that he did not consider or decide this question. The appellants do not contend that this change in the law is a jurisdictional question which this Court may consider for the first time on appeal under the provisions of Maryland Rule 885, so that pursuant to the provisions of Rule 885, we do not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the lower court, such as the question under discussion.

The appellants, however, vigorously contend that under the prior decisions of this Court in *Janda v. General Motors Corporation,* 237 Md. 161, 205 A. 2d 228 (1964) ; *Yorkdale Corporation v. Powell,* 237 Md. 121, 205 A. 2d 269 (1964) ; *Springloch Area Citizens Group v. Montgomery County Board of Appeals,* 252 Md. 717, 251 A. 2d 357 (1969) ; and *Dal Maso v. Board of County Commissioners for Prince George's County,* 264 Md. 691, 288 A. 2d 119 (1972), the decision of the Board should be held by us to be void because of the provisions of the amendatory legislation. In our opinion, this contention is unsound and the reliance of the appellants upon the cases mentioned is misplaced.

This Court has decided that a legislative change in

the law in regard to procedure, rather than in regard to substance, will be applied to matters and proceedings taking place after the effective date of the change in the law. Chief Judge Brune, for the Court, aptly stated the rule in *Beechwood Coal Co. v. Lucas,* 215 Md. 248, 254, 137 A. 2d 680, 683 (1958), as follows:

> ". . . [W]here the effect of the new statute is not to impair existing substantive rights but only to alter the procedural machinery involved in the enforcement of those rights, *such legislation is usually construed as operating on all proceedings instituted after its passage,* whether the right accrued before or after that date."

(Emphasis supplied.)

To the same effect, *see Richardson v. Richardson,* 217 Md. 316, 142 A. 2d 550 (1958) and *Janda, supra.* The appellants do not contend that the amendment requiring four affirmative votes for granting a special exception must be applied to a decision made after its enactment, but rather that the ordinance must be applied to invalidate a decision of the Board made some six and one-half months *prior* to its enactment.

The appellants are correct in pointing out that the petitioners had acquired no vested right to use the subject property for a medical clinic prior to the effective date of the amendatory legislation. They argue that the application of the general rule, *i.e.,* that we apply the zoning law existing at the time of the appeal rather than when the case was decided below, should result in the nullity of the Board's decision. This is correct when there is no vested right involved if the change in the law subsequent to the decision in the lower court makes the case moot because the prior statutory basis for the action below has been removed by statute. This was the situation in *Yorkdale* and *Dal Maso.* In *Springloch,* after the decision of the lower court affirming the Board's

grant of a special exception with a finding of need for the special exception as then required by the zoning ordinance, the County Council amended the ordinance to delete the requirement to show a need. Before our decision, however, the County Council again amended the zoning ordinance to restore the requirement that the applicant show a need by a preponderance of the evidence. In short, as a result of the last amendment, the applicable provision of the zoning law was the same as when the special exception was granted by the Board and passed upon on appeal by the circuit court. The problem of intervening change of law was, under the circumstances of that case, not presented for our decision.

In *Janda* the law regulating unemployment benefits was changed effective June 1, 1963, but the Board of Appeals of the Department of Unemployment Security at a hearing on June 12, 1963—eleven days *after* the effective date of the Act—failed to acknowledge the change in the law and failed to apply it. This Court reaffirmed the rule set forth and applied in *Beechwood Coal* and *Richardson,* both *supra.* This is quite a different situation from the one in the present case. It also does not appear in *Janda* whether or not the question of the effect of the amendatory legislation was raised or decided by the lower court and no question of any possible application of Rule 885 was mentioned or decided in the opinion in *Janda.*

We have concluded that the cases relied upon by the appellants are clearly distinguishable from the instant case and do not indicate that the action of the Board was made void by the subsequent amendment reouiring an affirmative vote of four members of the Board to grant a special exception.

### (2)

The questions of a possible violation of the zoning ordinance by the location of parking spaces only 12 feet from an adjacent rear yard instead of 30 feet and of a

waiver of a parking requirement by the Board when the authority to do this was in the Parking Lot Design Review Board were also not raised before or decided by the lower court. As these questions were raised for the first time on appeal, we will not decide them. Rule 885. If we considered them, we would have concluded that the contentions had no merit under the facts and circumstances of the present case.

### (3)

We consider now a question that was raised and decided below, *i.e.*, whether or not the decision of the Board in granting the special exception was unsupported by the evidence in the record and was consequently arbitrary and capricious.

The law is well settled in Maryland that upon appeal from the action of a zoning board, if that action is supported by any substantial evidence, then the matter before it was "fairly debatable" and the lower court should not substitute its judgment for that of the administrative body. On the other hand, if the action of the board was not supported by any substantial evidence, then such action was arbitrary and capricious and results in a denial of due process of law prohibited by Art. 23 of the Declaration of Rights in the Constitution of Maryland and should be reversed for this reason. *Dundalk Holding Co. v. Horn*, 266 Md. 280, 283, 292 A. 2d 77, 78-79 (1972) and cases therein cited.

The principal thrust of the appellants' argument is that if one assumes that the maximum number of 15 physicians and dentists were in constant five-day attendance at their offices and each had the maximum number of two employees present full time, then, upon the testimony of the petitioners' experts, the 60 parking spaces would not be sufficient and a traffic hazard would result from the granting of the special exception. This argument apparently appealed to two of the Board members as their dissenting opinion suggests. On the other hand, the

majority of three Board members concluded that, on the whole testimony, there would be no traffic or other hazards resulting from the use of the subject property for the proposed medical clinic, and further concluded that the petitioners had established, by a preponderance of the evidence, all of the required criteria for granting the special exception.

We have set out above, in some detail, the substance of the testimony offered by the petitioners and need not repeat it here. The proposal was for 11 physicians and dentists and the evidence indicated that they most likely would not be in their offices full time five days a week. Neither would they *all* have two employees. Both Mr. Sullivan and Mr. Hopkins concluded that on all of the relevant data, the 60 parking spaces—required by the zoning ordinance—were sufficient for adequate parking for the proposed special exception. Mr. Hopkins confirmed his opinion in this regard by his actual experience with parking in three analogous operations and found that the possible maximum parking did not, in fact, occur. As reasonable men, the three members of the Board who voted in favor of granting the special exception could have concluded—as they did—that there would be no traffic problem resulting from inadequate parking. They also could reasonably conclude that the other required criteria had been established by the testimony offered by the petitioners. In short, the issues were fairly debatable and the lower court, in accordance with the decisions of this Court, properly affirmed the Board's action in granting the special exception for the medical clinic.

*Order of December 23, 1971, affirmed, the costs to be paid by the appellants.*