999 A.2d 969

**Margaret McHALE**

v.

**DCW DUTCHSHIP ISLAND, LLC, et al.**

**No. 123, Sept. Term, 2009.**

Court of Appeals of Maryland.

July 22, 2010.

148

Paul J. Cucuzzella, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and Marianne E. Dise, Asst. Atty. Gen., of Baltimore, MD), on brief, for appellant.

Robert J. Fuoco of Glen Burnie, MD, for appellees.

Warren K. Rich (Rich and Henderson, P.C. of Annapolis, MD), on brief, for appellees.

Jonathan A. Hodgson, County Atty., Sarah M. Iliff, Senior Asst. County Atty., Anne Arundel County Office of Law, Annapolis, MD, brief of Amicus Curiae Anne Arundel County, Maryland.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

We consider here whether a recently amended provision (§ 8–1808(c)(4)) of the Chesapeake and Atlantic Coastal Bays Critical Area Protection Program ("Critical Area Law"), Md. Code (1973, 2007 Repl.Vol. & Supp.2009), Natural Resources Article, §§ 8–1801–8–1817, applies to a variance application filed three and one-half years before the General Assembly amended the statute and where the object of the application was to cure violations of the Critical Area Law occurring prior to the effective date of the amendment.[1] For reasons we shall explain, we affirm the judgment of the Circuit Court for Anne Arundel County and conclude that the amended provision does not apply retrospectively to the subject variance application.[2] In reaching that conclusion, we revisit a line of cases, somewhat peculiar to land use and zoning matters, regarding when statutory enactments have prospective only or retrospective application to pending matters and litigation. *See e.g., York-*

---

1. Unless otherwise noted, all statutory references are to the Natural Resources Article of the Maryland Code.

2. We assume, for the sake of argument, that the Chairperson of the Maryland Critical Area Commission, Margaret McHale, possessed the authority to bring the enforcement action that initiated this litigation, *see* Anne Arundel County's Amicus Curiae Brief at 10–11, 18, though it is argued that she does not because (1) she has not exhausted her administrative remedies and (2) that the ability to "void" a variance is outside her authority granted by State law. Because this issue, raised in the amicus brief, is not encompassed fairly in our grant of the writ of certiorari in this case, we shall not address its merits.

*dale Corp. v. Powell,* 237 Md. 121, 205 A.2d 269 (1964); *Layton v. Howard County Bd. of Appeals,* 399 Md. 36, 922 A.2d 576 (2007); and *Grasslands Plantation, Inc. v. Frizz– King Enters., LLC,* 410 Md. 191, 978 A.2d 622 (2009).

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

DCW Dutchship Island, LLC ("DCW") owns a 1.92 acre (83,635.2 square feet) island, known as Little Dobbins Island ("the Island"), located in the Magothy River in Pasadena, Anne Arundel County (the "County"), Maryland. It is designated as a limited development area ("LDA") under the County's Chesapeake Bay Critical Area Program.[4] Because it is surrounded by tidal waters of the Chesapeake Bay and contains slopes of 15% grade or greater, the entirety of the Island lies within either the buffer or the expanded buffer of

---

**3.** Because this is an appeal from the Circuit Court's grant of a defense motion to dismiss, we take as true all factual allegations in the Complaint. *RRC Northeast, LLC v. BAA Md., Inc.,* 413 Md. 638, 643, 994 A.2d 430, 434 (2010).

**4.** A 2008 amendment to § 8–1802 defined a "limited development area" to mean an area:
 1. That is developed in low or moderate intensity uses and contains areas of natural plant and animal habitat; and
 2. Where the quality of runoff has not been substantially altered or impaired.
§ 8–1802(a)(15)(i). An LDA includes an area:
 1. With a housing density ranging from one dwelling unit per five acres up to four dwelling units per acre;
 2. With a public water or sewer system;
 3. That is dominated by agricultural land, wetland, forests, barren land, surface water, or open space; or
 4. That is less than 20 acres and otherwise qualifies as an intensely developed area under paragraph (13) of this subsection.
§ 8–1802(a)(15)(ii).
The Anne Arundel County Code provides that the uses allowed in the LDA are those "allowed in the underlying zoning district in accordance with the requirements of the district in which the use is located, except that the maximum density allowed is the more restrictive of four dwelling units per acre or the density allowed in the zoning district in which the use is located." Anne Arundel County, Md., Code, § 18–13–205 (2005).

the Critical Area (the significance of the buffer and expanded buffer designations will be elaborated later in this opinion).

DCW obtained the Island from Dutchship, LLC, in 2000. At that time, the Island contained a three-bedroom summer cottage of about 1,911 square feet of floor area, which had existed on the Island for approximately fifty years (well before the advent of the Critical Area Law). Also located on the Island at that time was a boat house and deck, two small sheds, a pier, a dirt cart path, and some steps. At that time, the total man-made impervious surface area on the Island was approximately 3,005 feet.

In or about 2001, Daryl Wagner, a member of DCW and a Maryland registered home builder, acting on behalf of DCW, demolished the old summer cottage and removed the debris, without the necessary permits or variances required by the Critical Area Law and County ordinances. Then, Wagner constructed the following structures or impervious surface areas on the Island: (1) a new 2,883 square foot home; (2) replacement sheds for the two preexisting sheds; (3) a 66 square foot gazebo; (4) a boat ramp and concrete driveway with approximately 2,668 square feet of surface area to accommodate his amphibious vehicle; (5) 846 square feet of sidewalks; and (6) a pool and deck totaling 1,433 square feet.

Some of the aforementioned improvements were located in areas of the Island that, prior to Wagner's construction activities, contained slopes of 15% or greater. Wagner regraded some of these areas to accommodate the improvements. He did not obtain any permits or seek approval of the construction or plans for it from the County.[5] In November 2004, the

---

5. According to the Complaint, however, either Wagner, DCW or Dutchship, LLC, received permits or approvals from the County to replace the windows and siding on the now demolished cottage and "the placement of a 496 linear foot stone revetment along the southern shore of the Island, which was to serve the purpose of stabilizing and preventing erosion from the Island's southern shore." The Commission alleges that the work on the cottage did not occur. With respect to the revetment, the Commission alleges that it exceeded the scope of the permit in that the revetment is actually 676 feet in length.

County authorities discovered the construction activities on the Island and notified DCW of the numerous violations. On 28 December 2004, DCW sought variances from the unobserved requirements of the Critical Area Law for each of the structures and improvements on the Island.[6] DCW sought also an amendment to the critical area buffer map, which prohibits most development activity within 100 feet of the shoreline.

A County Administrative Hearing Officer heard the evidence for and against the requests for variances. The Magothy River Association ("MRA") appeared at the variance hearings on 5 June 2005 and 20 September 2005 to oppose DCW's requests. The Hearing Officer granted some of the variances on 27 October 2005. Wagner appealed administratively the denials, and the MRA, the Chesapeake Bay Foundation ("CBF"), and the Maryland Critical Area Commission for the Chesapeake and Atlantic Coastal Bays (the "Commission") appealed the decision to grant the variances, all to the County Board of Appeals.

While the variance case was percolating, on 20 October 2005, the County Planning and Zoning Officer approved in part the buffer map amendment request. MRA and CBF sought judicial review of that decision in the Circuit Court for Anne Arundel County.

The Honorable Paul F. Harris, Jr. of the Circuit Court, in a separate case from the present one, but arising from the same facts as the present controversy, described the relevant proceedings before the Board of Appeals:[7]

---

**6.** Apparently, Wagner and/or DCW subscribe to the business principle that it is better to seek forgiveness than permission.

**7.** Other than by way of Judge Harris's opinion and that of Judge Ronald A. Silkworth of the Circuit Court in the present case, the proceedings before the Board of Appeals were not made part of the record here. The proceeding before Judge Harris was for judicial review of the Board of Appeals's decision to grant some of the variances. An appeal of that case is pending in the Court of Special Appeals.

The Anne Arundel County Board of Appeals ("the Board") heard the appeals of both the variance decisions and the buffer map amendments. Owing to the complexity of and public interest in the Little Island dispute, the Board scheduled a series of consolidated hearings on both the buffer map amendments and the variance requests. Prior to the first hearing date, [the Commission] moved to bifurcate the hearings into separate proceedings because it had not participated in the buffer map appeal. The Board denied the motion to bifurcate. Thereafter, in hearings scattered over 24 days in 2006, the Board heard testimony from 30 witnesses, and considered ... hundreds of pieces of evidence. On January 3, 2007, the Board issued a written Memorandum of Opinion and Order ... that mapped Little Island "as partially buffer modified", and revised the Hearing Officer's decision in order to impose certain conditions on the grant of the variances.

(Footnotes omitted). Pursuant to § 604 of the Anne Arundel County Charter, the Commission filed a Petition for Judicial Review of the grant of the variances on 16 January 2007. The CBA and the MRA each sought judicial review on 31 January 2007 and 2 February 2007, respectively. DCW and Wagner filed a cross-petition in the Circuit Court on 2 February 2007.

While the foregoing battles were ongoing, on 25 September 2008, Margaret McHale, Chair of the Commission, filed another action (the present one) in the Circuit Court, a Complaint for Restoration and Mitigation against DCW and Wagner pursuant to an amendment to the Critical Area Law, Md. Code, Nat. Res. Art. § 8–1815(a)(2)(i)(1), enacted earlier in 2008.[8] She filed this action for restoration and mitigation

---

8. Section 8–1815(a)(2)(i), in addition to supplying the new requirements that are at the heart of Appellant's Complaint, purported to grant the Chair authority to bring suit against a person who violates an aspect of the Critical Area law:

A person who violates a provision of an order, permit, plan, local program, this subtitle, or regulations adopted, approved, or issued under the authority of this subtitle shall be:

based on amendments made to the Critical Area Program statutory scheme by the General Assembly during the 2008 Legislative Session. The General Assembly enacted an amendment to § 8–1808(c) of the Natural Resources Article, which provides the minimum standards for a local (in this case, the County) program sufficient to meet the goals of the Critical Area Program. The amendment at issue here required that, before a local jurisdiction could issue a permit, approval, variance, or special exception, the applicant shall prepare, and the local jurisdiction shall approve, a "restoration or mitigation plan ... to abate the impacts to water quality or natural resources as a result of the violation; ...." § 8–1808(c)(4)(ii). The applicant, before the local jurisdiction may take action, for example, on a variance application seeking relief from the Law's requirements, also must perform the abatement measures in the approved version of the mitigation/abatement plan. § 8–1808(c)(4)(iii). Because DCW had not prepared or carried out an approved restoration or mitigation plan, McHale alleged in her complaint that the variances granted by the Board of Appeals were null and void by operation of § 8–1808(c)(4), as amended. She sought relief in the form of the "deconstruction," removal, and abatement of the structures and improvements erected by Wagner and that the court order Wagner and DCW to restore and provide mitigation in accordance with a mitigation plan to be approved by the County.

The defendants filed a motion to dismiss arguing that the Complaint failed to state a claim upon which relief could be granted because the 2008 amendment should not be applied retrospectively to the variance application, which, by the time the Complaint was filed by McHale, had been granted (in part) by the Board of Appeals. Judge Silkworth, in a written Memorandum Opinion and Order, granted the defense motion to dismiss, with prejudice, finding (1) that the Legislature

---

1. Subject to prosecution or suit in circuit court or district court by the chairman or local authorities, who may invoke the sanctions and remedies afforded by State or local law....

intended for the 2008 amendment to be applied prospectively only and (2) that the changes made to the statute were procedural and not substantive, and, therefore, the Act should not be applied retrospectively.[9] McHale noted a timely appeal to the Court of Special Appeals. Before consideration of the appeal in the intermediate appellate court, we, on our initiative, issued a writ of certiorari, 411 Md. 598, 984 A.2d 243 (2009), to consider the following question:

> Did the trial court err in concluding that the provision of the 2008 Amendments to the Critical Area law requiring restoration, mitigation and abatement of Critical Area violations prior to receipt of a critical area variance does not apply to critical area violations in litigation at the time that the amendments took effect?

We answer that question "No" and hold that the trial court did not err.

## II. ANALYSIS

*A. Standard of Review*

When considering on appellate review the grant of a motion to dismiss a complaint for failure to state a claim upon which relief may be granted,

> a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences,

---

**9.** With regard to the conclusion that the Legislature intended for the 2008 amendments to have prospective application only, the Circuit Court adopted the reasoning of Judge Harris's opinion in the separate case involving the Commission's Petition for Judicial Review of the variances granted by the Board of Appeals. Judge Silkworth, in the present case, stated that he adopted Judge Harris's opinion, and could dispose of the motion on that ground, but nevertheless wrote further "to examine if, assuming that the Legislature did not intend the Act to be given prospective effect, the changes made by the Act would be deemed procedural or substantive." Hence, Judge Silkworth's "belt-and-suspenders" exposition regarding the procedural versus substantive nature of the statutory amendment.

if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted.

*RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643, 994 A.2d 430, 433 (2010). "Upon appellate review, the trial court's decision to grant such a motion is analyzed to determine whether the court was legally correct." *Id.* at 644, 994 A.2d at 434. We will uphold the dismissal only " 'if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff.' " *Sprenger v. Pub. Serv. Comm'n*, 400 Md. 1, 21, 926 A.2d 238, 250 (2007) (quoting *Pendleton v. State*, 398 Md. 447, 459, 921 A.2d 196, 203 (2007)).

## B. Relevant Critical Area Program Statutory Framework

In 1984, the General Assembly enacted the Critical Area Law "[t]o establish a Resource Protection Program for the Chesapeake and the Atlantic Coastal Bays and their tributaries by fostering more sensitive development activity for certain shoreline areas so as to minimize damage to water quality and natural habitats . . . ." § 8–1801(b)(1). The passage of the Critical Area Law was based on the Legislature's recognition that the quality and productivity of the waters of the Chesapeake Bay "have declined due to the cumulative effects of human activity that have caused increased levels of pollutants, nutrients, and toxics in the Bay System and declines in more protective land uses such as forestland and agricultural land in the Bay region . . . ." § 8–1801(a)(5). The Legislature found also that "[t]he cumulative impact of current development and of each new development activity in the buffer is inimical to [the restoration of the Bays and their tributaries and minimizing further impact to water quality and the shoreline], and it is therefore imperative that State law protect irreplaceable State buffer resources from unpermitted activity . . . ." § 8–1801(a)(9). The "critical area" includes "all land and water areas within 1,000 feet beyond the landward boundaries of State or private wetlands and the heads of tide designated under Title 16 of the Environment Article." § 8–1807(a)(2).

The General Assembly vested the Commission with "all powers necessary for carrying out the purposes" of the Critical Area Law, including the authority to promulgate regulations for the administration and enforcement of the program, including regulations governing the establishment of comprehensive standards and procedures for buffer establishment and the protection and conservation of the buffer. § 8–1806(a)–(b). The "buffer" "means an existing, naturally vegetated area, or an area established in vegetation and managed to protect aquatic, wetlands, shoreline, and terrestrial environments from manmade disturbances." § 8–1802(a)(4). At the time of the operative facts of this case, the "buffer" was, at minimum, a 100–foot area "landward from the mean high water line of tidal waters, tributary streams, and tidal wetlands." [10] COMAR 27.01.09.01 C(1) (2007). With certain exceptions, "[n]ew development activities, including structures, roads, parking areas, and other impervious surfaces, mining and related facilities, or septic systems may not be permitted in the Buffer...." COMAR 27.01.09.01 C(2). The General Assembly charged the local jurisdictions, however, with the primary responsibility of developing and implementing a critical area program, subject to review and approval by the Commission. § 8–1808(a). The local jurisdiction may grant a variance to the Critical Area criteria when a "literal enforcement of provisions within the jurisdiction's Critical Area program would result in unwarranted hardship to an applicant." [11]

---

**10.** In 2008, the General Assembly increased the minimum buffer area to "200 feet from tidal waters or a tidal wetland." § 8–1808.10(b)(1)(i); 2008 Md. Laws Ch. 119, § 1. The minimum buffer remained at 100 feet for a tributary stream. § 8–1808.10(b)(1)(ii); 2008 Md. Laws ch. 119, § 1. The newly enacted legislation superseded the regulations, which no longer exist.

**11.** The local jurisdiction is to make provisions for the granting of variances. At a minimum, the variance provisions must provide for the following:

(1) That findings are made by the local jurisdiction which demonstrate that special conditions or circumstances exist that are peculiar to the land or structure within the jurisdiction's Critical Area program, would result in unwarranted hardship;

COMAR 27.01.11.01 A. The Anne Arundel County Code extends the buffer "to include contiguous sensitive areas, such as slopes of 15% or greater...." Anne Arundel County, Md., Code, § 18–13–104(a) (2005). The contiguous sensitive areas are known as the "expanded buffers." § 18–13–104. All of those provisions were in place before Wagner commenced his extra-legal demolition and construction activities on the Island.

Critical to the present case, in 2008, the General Assembly adopted House Bill 1253, which amended the Critical Area Law to include a new provision restricting a local jurisdiction from issuing "a permit, approval, variance, or special exception unless the person seeking the permit, approval, variance, or special exception has ... prepared a restoration or mitigation plan, approved by the local jurisdiction, to abate impacts to water quality or natural resources as a result of the violation" and "[p]erformed the abatement measures in the approved plan in accordance with the local critical area program." § 8–1808(c)(4)(ii)(iii). We shall elaborate on relevant portions of the Session Law of this enactment shortly.

> (2) That a literal interpretation of this subtitle or the local Critical Area program and related ordinances will deprive the applicant of rights commonly enjoyed by other properties in similar areas within the Critical Area of the local jurisdiction;
>
> (3) That the granting of a variance will not confer upon an applicant any special privilege that would be denied by this subtitle or the local Critical Area program to other lands or structures within the jurisdiction's Critical Area;
>
> (4) That the variance request is not based upon conditions or circumstances which are the result of actions by the applicant, nor does the request arise from any condition conforming, on any neighboring property;
>
> (5) That the granting of a variance will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat within the jurisdiction's Critical Area, and that the granting of the variance will be in harmony with the general spirit and intent of the Critical Area law and the regulations adopted in this subtitle; and
>
> (6) That applications for a variance will be made in writing to the local approving authority with a copy provided to the Commission.
> COMAR 27.01.11.01 A(1)-(6).

*C. Retrospective Application of Statutes*

Whether the application of a newly enacted statutory provision may be applied in a retrospective manner to given situations has proven tricky business in the appellate reports over the years. The conundrum sometimes presented by this query becomes more complex when the given situation implicates a land use or zoning context. This is so because of a somewhat anachronistic line of cases that carve out a special rule for such contexts. *See infra* note 14.

■ Generally, all "statutes are presumed to operate prospectively." *Layton v. Howard County Bd. of Appeals,* 399 Md. 36, 51, 922 A.2d 576, 585 (2007). *See also Wash. Suburban Sanitary Comm'n v. Riverdale Heights Volunteer Fire Co.,* 308 Md. 556, 560, 520 A.2d 1319, 1321 (1987). This presumption is based on the "fundamental principle of jurisprudence . . . that retroactive application of new laws is usually unfair." Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 41:2 (7th ed. 2009). "The rationale underlying the general rule provides that retrospective application, which attempts to determine the legal significance of acts that occurred prior to the statute's effective date, increases the potential for interference with persons' substantive rights." *Riverdale Heights,* 308 Md. at 561, 520 A.2d at 1322.

■ There is, however " 'no absolute prohibition against retroactive application of a statute.' " *Grasslands Plantation, Inc. v. Frizz–King Enters., LLC,* 410 Md. 191, 218, 978 A.2d 622, 638 (2009) (quoting *Langston v. Riffe,* 359 Md. 396, 406, 754 A.2d 389, 394 (2000)). "The presumption against retrospectivity is rebutted only where there are clear expressions in the statute to the contrary." *Riverdale Heights,* 308 Md. at 561, 520 A.2d at 1322. Where it is clear that the Legislature intended the statute to be applied retrospectively, we will construe the law in such a manner. *Grasslands,* 410 Md. at 218, 978 A.2d at 638. *See also* Singer, *supra,* § 41:4 ("[A] law is not construed as retroactive unless the act clearly, by

express language or necessary implication, indicates that the legislature intended a retroactive application.").[12]

If retrospective construction of a statute would interfere, impair, or divest a vested right, a court should construe prospectively the statute. Singer, *supra*, § 41:6. The converse is that the court may construe a statute as applying retrospectively that affects a non-vested right or mere expectancy, if there is a demonstrated legislative intent to that end. *Id. See also Grasslands*, 410 Md. at 220, 978 A.2d at 638 ("Another exception [to the presumption against retroactive application of statutes] is for remedial enactments that do not impair vested rights."); *Janda v. Gen. Motors Corp.*, 237 Md. 161, 169, 205 A.2d 228, 232 (1964) ("A statute, even if the Legislature so intended, will not be applied retrospectively to divest or adversely affect vested rights . . . .").

The distinction between vested rights and mere expectancies is perhaps the principal reason this Court identified and continues to recognize an exception in the context of land use and zoning cases to the general presumption in favor of prospective applications of statutes. In *Yorkdale Corp. v. Powell*, 237 Md. 121, 126, 205 A.2d 269, 272 (1964), we stated that "an applicant for rezoning to a more intense use of his property, who has been successful before the zoning authorities and the circuit court does not acquire a vested or substantive right which may not be wiped out by legislation which takes effect during the pendency in this Court of the appeal from the actions below." We held that, in the context of a zoning or land use matter, we will apply a substantive change to a statute during the course of litigation. *Id.* at 126–27, 205 A.2d at 272.

---

**12.** At least in the context of statutory construction, there is no significant difference between "retrospective" and "retroactive." They "are synonymous in judicial usage and may be employed inter-changeably. They describe acts which operate on transactions which have occurred or rights and obligations which existed before passage of the act." *Grasslands*, 410 Md. at 218, 978 A.2d at 637 (quoting *Langston*, 359 Md. at 406, 754 A.2d at 394).

*"Yorkdale,* as an exception to the general rule, provides for the retrospective application of changes to statutes that impact land use issues made during the course of litigation in land use and zoning cases." *Layton,* 399 Md. at 51, 922 A.2d at 585. In *Yorkdale,* the Baltimore County Zoning Commissioner granted a residential density variance to a landowner. A neighbor appealed to the Circuit Court for Baltimore County, which reversed the Zoning Commissioner's decision. Yorkdale obtained review by this Court. After oral argument, but before we rendered a decision, the Baltimore County Council passed a bill which provided that " 'no increase in residential density . . . shall be permitted as a result of any grant of a variance from height or area regulations.' " 237 Md. at 124, 205 A.2d at 270–71. Upon being apprised of this fact, we set the case for re-argument on whether the change in the law mooted the case. *Id.* at 124, 205 A.2d at 271. In deciding that question, we stated first that "Maryland has consistently followed the rule that 'an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence.' " *Id.* (quoting *Woman's Club v. State Tax Comm'n,* 195 Md. 16, 19, 72 A.2d 742, 743 (1950)). An appellate court will apply a change in the law "after a decision below . . . unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent." *Id.* We distinguished, however, a substantive change in the law versus a procedural one, for purposes of this application. Where the change in the law during the pendency of the zoning or land use litigation works only a procedural change to the law, we will not construe that law as applying retrospectively to the case before the Court. *Id.* at 126–27, 205 A.2d at 272. Finding no contrary legislative intent in *Yorkdale,* and thus the case to be moot, we dismissed the appeal. *Id.* at 133, 205 A.2d at 276. In reaching that conclusion, we relied upon several cases where we held that a material zoning change that occurred during pending litigation of a petition for a zoning reclassification superseded any decision made before the legislative body made the change.

*See Grau v. Bd. of Zoning Appeals,* 210 Md. 19, 23, 122 A.2d 824, 826 (1956); *Lake Falls Ass'n v. Bd. of Zoning Appeals,* 209 Md. 561, 565–66, 121 A.2d 809, 811 (1956); *Banner v. Home Sales Co. D.,* 201 Md. 425, 94 A.2d 264 (1953).[13]

We re-affirmed the principles of *Yorkdale* in *Layton.* Layton operated an exotic wildlife refuge and sanctuary in Howard County for six years before the County issued a notice to Layton that she was in violation of a zoning regulation by operating a charitable and philanthropic institution without an approved special exception. Layton filed a petition for a special exception to operate the existing wildlife rehabilitation center and primate sanctuary. The Board of Appeals granted in part and denied in part the petition. Specifically, the Board granted a special exception to operate as a charitable and philanthropic institution, including the permitting of an animal rehabilitation center on the property, but denied an exception to operate a primate or other exotic wildlife sanctuary. Layton appealed to the Circuit Court for Howard County. Prior to even a hearing before the Circuit Court, Howard County amended the County Code to allow an exotic or wild animal sanctuary as a permitted use. Thus, under the new law, as amended, Layton's sanctuary may have been allowed. The Circuit Court, however, declined to apply the new law retrospectively to Layton's petition. Layton appealed to this Court and we held that the *Yorkdale* rule applied because the change to the Howard County zoning law was a substantive change. *Id.* at 70, 922 A.2d at 596.

We re-affirmed *Yorkdale* expressly and highlighted that in *Yorkdale,* after Howard County changed the ordinance, we set that case for re-argument:

> It is clear that the Court realized the importance of what it was doing. The Court had already heard the case, then directed that it be reargued based upon the possible retrospective applicability of a change in law. The *Yorkdale* rule was not an unintended holding related to some larger issue.

13. Apparently, *Banner* was not reported in the Atlantic Reports.

It was specifically considered by the Court and it was the major holding of the case. It is a holding that has stood the test of time.

399 Md. at 54 n. 15, 922 A.2d at 586 n. 15.

We noted that, following *Yorkdale,* "we have reaffirmed those principles in relation to land use and zoning cases several times." *Id.* at 56, 922 A.2d at 587 (citing *Anne Arundel County v. Maragousis,* 268 Md. 131, 299 A.2d 797 (1973); *Dal Maso v. Bd. of County Comm'rs,* 264 Md. 691, 288 A.2d 119 (1972); *Springloch Area Citizens Group v. Montgomery County Bd. of Appeals,* 252 Md. 717, 251 A.2d 357 (1969); *Marathon Builders, Inc. v. Montgomery County Planning Bd.,* 246 Md. 187, 227 A.2d 755 (1967); *Mandel v. Board of County Comm'rs,* 238 Md. 208, 208 A.2d 710 (1965)). We stated:

> *Yorkdale* and its progeny have never been overruled. They are still good law and are determinative in evaluating whether, in a land use or zoning case, a change in statutory law taking place during the course of a litigated issue should have retrospective application. As discussed *supra,* we shall consider zoning cases based upon the law as it exists at the time the case is before us.

399 Md. at 58, 922 A.2d at 589 (footnote omitted). Although the Court included a quotation from the Court of Special Appeals's decision in *Layton* indicating that the intermediate appellate did not find any legislative intent expressed in the statute, it does not appear from the decision whether the amendment expressed any intent with regard to prospective versus retrospective application. *Id.* at 46, 922 A.2d at 582 (quoting *Layton v. Howard County Bd. of Appeals,* 171 Md. App. 137, 172–73, 908 A.2d 724, 744 (2006)). We held that the amendments applied retrospectively to *Layton's* situation. *Id.* at 70, 922 A.2d at 596. We remanded the case to the Board of Appeals with directions that it shall apply the law as it existed at the time of our decision. *Id.*[14]

---

**14.** Although continuing to honor the *Yorkdale* doctrine here, we are not unmindful of Judge Wilner's thoughtful dissenting opinion in *Layton.*

We revisited the *Yorkdale* rule most recently in *Grasslands*, a case involving a challenge to a subdivision application by an adjacent property owner. In that case, the County passed ordinances during the pendency of a subdivision application appeal in a circuit court and the Court of Special Appeals. The new ordinances required the local Planning Commission, when considering whether to approve a proposed subdivision or site plan, to determine (1) whether the proposed development conforms to the visions, objective, and policies of the County's Comprehensive Plan Conformity Ordinance ("Conformity Ordinance") and (2) whether the plan provides for public safety through compliance with the State Fire Code and with any applicable County or municipal fire codes ("Emergency Service Ordinance"). The new ordinances did not contain clear expressions of legislative intent regarding prospective versus retrospective application. 410 Md. at 218, 978 A.2d

Although acknowledging that the majority opinion was based on well established precedent, he expressed his disagreement with the special treatment the Court gives to zoning and land use cases with regard to analysis of prospective versus retrospective application of changes in law occurring during pending litigation. He opined that, subject only to constitutional restrictions, the Court defers typically to the Legislature's determination, expressed in the statute, whether a law should be applied retrospectively. The problem arises when there is no apparent intent discernable on this score. In that instance, Judge Wilner noted that generally we take the opposite approach from that we take in land use and zoning cases.

> In those situations, we have generally applied the principle that, if the change is one of procedure only, we will apply the new law even if doing so would produce a different result than not doing so. If the change affects substance, however, we will not apply the new law, at least if doing so would produce a different result. In that circumstance, we do not permit the rules to be changed mid-stream.

399 Md. at 72, 922 A.2d at 597. Judge Wilner, acknowledging that although those distinctions may have merit, questioned why we treat zoning and land use cases differently:

> When we start carving out categorical exceptions to them, however, both their rationality and their jurisprudential basis are eroded. Why just zoning or land use cases? What is so special about them? They involve property, but only real property. Is real property somehow more, or less, sacred than other kinds of property, including contractual rights?

*Id.* He failed to see "any legitimate reason for drawing a distinction between zoning cases and other kinds of cases." *Id.*

at 638. The issue by which the case was disposed of, however, was whether the Board of Appeals applied correctly the burden of proof in the administrative proceeding. We held that the Board erred in imposing the burden on the landowner-protestant. *Id.* at 194, 978 A.2d at 623.

As to whether the new ordinances should be applied on remand, we reaffirmed in considered dicta the principle enunciated in *Yorkdale* and *Layton* that there is a "general presumption *in favor of* retroactivity in zoning and land use cases." *Id.* at 220, 978 A.2d at 639 (emphasis in original). We expressed our disapproval, however, of "imprecise" language in *Luxmanor Citizens Ass'n, Inc. v. Burkart,* 266 Md. 631, 644–45, 296 A.2d 403, 410 (1972),[15] where we expressed the following reasoning: "This Court has decided that a legislative change in the law in regard to procedure, rather than in regard to substance, will be applied to matters and proceedings taking place after the effective date of the change in the law." We concluded in *Grasslands,* however, that that language was "imprecise" and "problematic." 410 Md. at 223, 224, 978 A.2d at 640, 641. We opined that *"Luxmanor's* imprecision lay in articulating the rule about legislative changes in procedural laws as if there were a wholesale distinction between modification of a procedural land use law and modification of a substantive land use law." *Id.* at 224, 978 A.2d at 641. We, thus, could "fathom no sensible reason for drawing a wholesale distinction between new procedural zoning/land use legislation and new substantive zoning/land use legislation, and applying to the former more restrictively than other procedural legislation, when we still apply the latter less restrictively than other substantive legislation." *Id.* at 226, 978 A.2d at 642. Rather, "[w]e believe the analysis is

---

**15.** *Luxmanor* held that an amendment to a county zoning ordinance requiring an affirmative vote of four member of the Board of Appeals, rather than a majority as the ordinance required formerly, did not render invalid the Board's decision to grant a special exception to construct and operate a medical clinic. 266 Md. 631, 646, 296 A.2d 403, 411. We based the holding largely on appellants' failure to raise the impact of the amendment in the trial court. *Id.* at 644, 296 A.2d at 410.

slightly more complex, *i.e.*, if the new law is procedural, the decision about retroactivity will turn on what aspect of the administrative/adjudication process is changed, at what point in the administrative/adjudication process the change is made, and the question presented to the reviewing court." *Id.* at 227–28, 978 A.2d at 643 (footnote omitted).

We concluded in *Grasslands* that the Emergency Services Ordinance was substantive, and, thus, should be applied at the new hearing "because it is the law in effect at the time of the hearing, and does not impair vested rights." *Id.* at 228, 978 A.2d at 644. With regard to the Conformity Ordinance, we determined that provision shall also apply, even if it was procedural, "because the Commission's or Board's process of making its decision will *begin anew* for an independent reason," i.e., the remand resulting from the improper allocation of the burden of proof in the original administrative hearing. *Id.* at 229, 978 A.2d at 644 (emphasis in original). Thus, we did not remand the matter simply because the law changed in the intervening time between the administrative hearing and the appeals. "[B]ecause we remand to the Board for a new hearing due to the burden of proof issue, we look forward—to decide what should occur in the future, as the proceedings recommence." *Id.* at 228, 978 A.2d at 643–44. Therefore, when the Board undertook new hearings with the proper allocation of the burden of proof, the Board was to apply the new procedural requirements. We did not, however, contrary to the Commission's theory in the present case, reject completely the distinction between procedural and substantive changes to zoning law. "[W]e should not duplicate expenditure of the parties' and administrative agency's resources for a new hearing simply to apply a new rule, that is arguably procedural, when the hearing was done correctly in the first place." *Id.* at 228, 978 A.2d at 644.[16]

---

**16.** In *Arundel Corp. v. County Commissioners,* 323 Md. 504, 594 A.2d 95 (1991), we considered whether a newly enacted ordinance applied to a pending application for a conditional use of land. In that case, before the Board of Zoning Appeals held a hearing on Arundel's application, the County Commissioners enacted a new ordinance providing that an

In *Armstrong v. Mayor and City Council,* 409 Md. 648, 976 A.2d 349 (2009), the Baltimore City Council made substantive amendments to the City zoning map while litigation related to a permit to construct a parking lot was ongoing. The amendment did not express the City Council's intent with regard to retrospective versus prospective application, but stated only an effective date. We held that the change applied retrospectively and rendered the pending permit matter moot because the change rendered the parking lot use as allowed. *Id.* at 674, 976 A.2d at 365.

We re-affirmed again the *Yorkdale* doctrine in *Scrimgeour v. Fox Harbor, LLC,* 410 Md. 230, 978 A.2d 645 (2009). Scrimgeour challenged the issuance of a building permit to one of his neighbors to build a structure. The County Board of Appeals and the Circuit Court for Talbot County affirmed the decision to issue the permit. Scrimgeour noted an appeal to the Court of Special Appeals. We granted certiorari prior to consideration by that court. After certiorari was granted, but before oral argument, the Talbot County Council repealed

---

application for the designation sought by Arundel required special information which was to accompany an application for a conditional use for extracting gravel. The prior ordinance contained general regulations, but no specific requirements. The Board attempted to return the non-compliant applications to Arundel's counsel, but counsel refused to accept the return. Because Arundel Corp.'s application did not comply with the new ordinance, the Board did not hold a hearing on the application, determining that it lacked jurisdiction to process the applications.

Arundel appealed to the Circuit Court, which found that the new ordinance contained substantive changes to the law. Finding the Board's dismissal of the application to be "unfair," the trial court remanded the matter to the Board with instructions that it consider the application in accordance with the provisions in place at the time Arundel filed its applications.

The Court, without discussing *Yorkdale* or any cases following *Yorkdale,* held that the Board dismissed improperly the application and we remanded the matter to the Board. 323 Md. at 510, 594 A.2d at 98. The merits of whether the Board could apply the new ordinance on remand were not reached. *Id.* Thus, *Arundel Corp.* treated the matter before it as if it were a generic appeal from an administrative decision instead of, as it should have, as the review of a land use or zoning case. There was no discussion of whether the amendment effected a procedural or substantive change.

the County's Zoning Code in its entirety and enacted new land use provisions, which worked substantive changes to the provisions relevant to the landowner's permit. The new zoning code included only the effective date; it does not appear from the opinion that the Talbot County Council expressed any other intent regarding the retrospective application of the new code. We asked the parties to submit supplemental briefs concerning the applicability of the code changes. We reaffirmed the *Yorkdale* doctrine and remanded the matter to the Board of Appeals so that it could "consider[ ] and determin[e] ... the effect of the new code on the dispute." *Id.* at 234, 978 A.2d at 647.

In the present case, as noted *supra*, the Circuit Court concluded that the enactment of § 8–1808(c)(4) should not be applied retrospectively because it (1) effects a procedural change to the Critical Area Law, as opposed to a substantive change, and (2) the Legislature intended for the law to apply prospectively. The Commission argues that the 2008 amendments apply to DCW's development activities on the Island, notwithstanding the fact that the revisions became effective approximately three and one-half years after DCW filed its application for variances, the object of which applications was to cure the violations of the Critical Area Law that also predated the 2008 amendments. Citing *Yorkdale*, the Commission asserts that the Circuit Court should have applied retrospectively the amendments because they affected a substantive change in that they established new duties and obligations that both property owners and local jurisdictions must satisfy before a property owner may obtain a variance.

DCW argues that the *Yorkdale* doctrine does not apply because the amendments represent procedural, rather than substantive, changes, i.e., the amendments do not change the standards by which the Board would approve or disapprove a variance. Furthermore, DCW argues that the *Yorkdale* doctrine is inapplicable to the present case because it does not involve a classical "land use" issue, although conceding that the Critical Area Law on which this case hinges may be classified as a "land use" regulation. Rather, DCW argues

that this is simply an enforcement action meant to punish DCW.

We shall address first the applicability of *Yorkdale* and its progeny to the context of a Critical Area Law variance application. Is it a zoning or land use case? Although this Court, before today, has not applied the *Yorkdale* doctrine in connection with a Critical Area Law matter, the Court of Special Appeals has done so in *Becker v. Anne Arundel County*, 174 Md.App. 114, 920 A.2d 1118 (2007) and *Wharf at Handy's Point, Inc. v. Department of Natural Resources*, 92 Md.App. 659, 610 A.2d 314 (1992).

*Becker*, similarly to the present case, involved an application for a variance from a local Critical Area Law and program requirement. The landowners filed an application for a variance, which the Board of Appeals denied. The Circuit Court affirmed the Board's decision. While the case was pending before the Board of Appeals, the General Assembly amended the requirements for obtaining a variance. The Court of Special Appeals, although not citing or discussing *Yorkdale*, acknowledged that "absent an express statement to the contrary by an enacting legislative body, changes to both State and County land use laws, affecting the status of property, apply to matters that are pending and not yet decided by the agency responsible for de novo decision making." 174 Md. App. at 134, 920 A.2d at 1130. The court held that because there was neither contrary legislative intent nor had the property owner obtained vested rights, the changes to the county ordinances applied to the pending variance application. *Id.* at 135, 920 A.2d at 1131.

*Wharf at Handy's Point* involved an amendment to a Kent County zoning ordinance which provided for direct appeal to the Circuit Court from orders of the county Planning Commission. At the time of the administrative hearing, the zoning ordinance provided that the County Board of Appeals shall hear appeals of a local administrative decision. 92 Md.App. at 660–61, 610 A.2d at 314. The Critical Area Commission, prior to the effective date of the relevant change in the law,

appealed directly to the Circuit Court from the decision of the Planning Commission. The Circuit Court held that the Commission possessed a right of direct appeal to the Circuit Court. The wharf owner moved to dismiss the appeal on the ground that the Commission did not have statutory authority to appeal directly to the Circuit Court. The Circuit Court denied the motion and reversed the Planning Commission's grant of final site plan approval.

In the Court of Special Appeals, the wharf owner sought to dismiss the Commission's appeal on the ground that the Commission did not exhaust its administrative remedies because it failed to appeal to the Board of Appeals. The parties agreed that the amendment to the ordinance was procedural and, accordingly, the court held that the *Yorkdale* doctrine did not apply. *Id.* at 674, 675 n. 8, 610 A.2d at 321, 321 n. 8. Thus, the amended ordinance did not apply retrospectively to give the Commission the right to appeal directly to the Circuit Court. *Id.* at 676, 610 A.2d at 322. We find *Becker* and *Wharf at Handy's Point* persuasive and see no reason why *Yorkdale* and its progeny should not be in play in the context of a case involving the application of the Critical Area Law and regulations to a piecemeal variance application seeking relief from its requirements. The Commission brought this suit to prevent the issuance to DCW of variances, a classic land use and zoning application, from the Critical Area Law.

 Our review of *Yorkdale* and its progeny indicates that, in land use and zoning cases, the general presumption is that, in the absence of contrary legislative intent, a substantive change to the law occurring during the pendency of land use litigation and before any substantive rights vest, is to be applied to the pending litigation matter, i.e., understood therefore to be applied retrospectively to some extent. *Yorkdale,* however, recognized the primacy of the Legislature's intent when determining whether a change to the law applies prospectively or retrospectively. *See Yorkdale,* 237 Md. at 124, 205 A.2d at 271 ("[A] change in the law after a decision below and before final decision by the appellate Court will be applied

by that Court unless vested or accrued substantive rights would be disturbed or *unless the legislature shows a contrary intent.*") (emphasis added) (citations omitted). The *Yorkdale* doctrine thus is actually the default rule that we apply where there is no clear legislative intent directing retrospective application. The doctrine does not engage where there is clear legislative intent that the law shall be applied prospectively only.

■■■■■ Thus, we apply the traditional rules of statutory construction when there is indication that the Legislature intended for the land use or zoning statute to have prospective application only. Our primary duty when interpreting the language of a statute is to effectuate and ascertain the intent of the Legislature. *Rosemann v. Salsbury Clements*, 412 Md. 308, 314, 987 A.2d 48, 52 (2010). We do this by construing " 'the plain language of the statute, and ordinary, popular understanding of the English language.' " *Id.* at 314–15, 987 A.2d at 52 (quoting *United States v. Ambrose*, 403 Md. 425, 438, 942 A.2d 755, 763 (2008)). "If the language of the statute is clear and unambiguous, we need look no further than the language of the statute to ascertain the Legislature's intent." *Id.* at 315, 987 A.2d at 52. Conversely, where the language of the statute is ambiguous, "we usually look beyond the statutory language to the statute's legislative history, prior case law, the statutory purpose, and the statutory structure as aids in ascertaining the Legislature's intent." *Id.*

■■■■ We consider, as the Circuit Court did, the uncodified language in Section 5 of House Bill 1253, as enacted in Ch. 119 of the 2008 Laws of Maryland, to shed light on the legislative intent. Section 5 provides:

That for the purpose of a criminal prosecution under § 8–1815(a)(2)(ii) of the Natural Resources Article, as enacted under Section 1 of this Act, this Act shall be construed prospectively to apply only to a Critical Area violation alleged to have arisen out of an act or omission that originated on or after July 1, 2008, *and this Act may not be applied or interpreted to have any effect on or application*

*to an alleged critical area violation that originated before the effective date of this Act.*

2008 Md. Laws Ch. 119, § 5 (emphasis added). DCW claims that Chapter 119 expresses that the Legislature intended for the amended § 8–1808(c)(4) to be applied prospectively only. The Commission argues that the first clause implicating criminal prosecutions in § 5 indicates that the Legislature intended for the rest of that section to apply only to criminal prosecutions, and not to an enforcement action. We conclude this section to be unambiguous, albeit somewhat oddly worded. Section 5 contains two clauses. The first, as noted *supra,* involves criminal prosecutions under § 8–1815(a)(2)(ii) of the Natural Resources Article and provides for a three-year statute of limitation for a criminal prosecution for a Critical Area violation. Thus, the first clause of Section 5 provides that, with regard to a criminal prosecution for a Critical Area violation, the three-year statute of limitation shall only apply prospectively to acts or omissions that originated on or after 1 July 2008, the effective date of the Act.

The second clause of § 5 provides: "and this Act may not be applied or interpreted to have any effect on or application to an alleged critical area violation that originated before the effective date of this Act." 1 July 2008 was the effective date. 2008 Md. Laws Ch. 119, § 10. We read the second clause as declarative of a different, but related, intent from the first. The Legislature's use of the conjunctive ("and") to introduce the second part of the section indicates that it did not intend for the prospective nature of the statute to be limited only to criminal prosecutions. Acceptance of the Commission's argument would render meaningless and nugatory the second clause of the section. "We construe the [language of a statute] so as to give effect to each word so that no word, clause, sentence or phrase is rendered superfluous or nugatory." *Foley v. K. Hovnanian at Kent Island, LLC,* 410 Md. 128, 152, 978 A.2d 222, 237 (2009). Upon a careful reading of the section, and applying the plain meaning rule of statutory interpretation, we agree with DCW that the Legislature intended for the 2008 amendments to be applied prospec-

tively to situations where an underlying violation of the Critical Area Law pre-dated the amendment. Unlike *Scrimgeour, Grasslands, Armstrong, Layton, Yorkdale,* and *Becker,* where apparently there was no demonstrative legislative intent that the amendment or new law shall be applied prospectively only, here, there is legislative intent to that effect. Not only did the Legislature include an effective date for the statute, but it also expressed that the Act is to have no effect on Critical Area Law violations originating before that date. Clearly, Wagner's and DCW's misconduct pre-dated the effective date of the amendment. The outcome of the attempt to cure that misconduct through the variance application will be decided in the litigation pending in the Court of Special Appeals. We hold that the requirement in § 8–1808(c)(4), as amended, to prepare and perform an approved restoration or mitigation plan, is to be applied prospectively only to variance applications seeking to cure violations occurring before the effective date of the amendment. Because we conclude that the Legislature intended for the amendments to apply prospectively only, we need not address whether the amendments constituted procedural or substantive changes or, if procedural, how the *Grasslands* analysis might apply. Accordingly, we hold that the Circuit Court did not err in granting DCW's motion to dismiss.[17]

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

17. DCW argues that a retrospective application of the 2008 amendments is unconstitutional as it is prohibited by the Ex Post Facto Clause and represents an unconstitutional bill of attainder. Because we hold that the Legislature intended for the 2008 Amendments to apply prospectively only, we shall not address DCW's constitutional arguments.