REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1533

September Term, 2013

_____

LISA TOMLINSON, ET AL.

v.

BKL YORK, LLC, ET AL.

_____

Woodward,
Wright,
Berger,

JJ.

_____

Opinion by Wright, J.

_____

Filed: October 7, 2014

On September 13, 2013, the Circuit Court for Baltimore County issued a memorandum opinion and order affirming the decision of the Baltimore County Board of Appeals ("Board of Appeals"), which affirmed the decision of the Office of Administrative Hearings of Baltimore County ("OAH"), which ruled that appellees, BKL York I LLC, BKL York III LLC, Logwood LLC, Wawa Inc., and Monterey Improvement Association (collectively, "Developers"), were not required to obtain a County Council Resolution ("Resolution") authorizing the amendment of their Planned Unit Development ("PUD") plan. On September 30, 2013, appellants, Lisa Tomlinson and Douglas Miller (collectively, "appellants"), timely noted this appeal, asking us to determine whether Developers were required to seek a Resolution by the County Council authorizing the material amendment of the commercial PUD plan.

For the reasons that follow, we affirm the circuit court's judgment and the OAH's decision.

## Facts

This appeal concerns 10111 York Road, a vacant lot located at the northeast corner of York Road and Halesworth Road in Cockeysville, Baltimore County, Maryland. At one point, this lot was zoned as "BR-IM"[1] and was improved with a Shell Oil service

---

[1] "BR-IM" is a zoning designation used in Baltimore County. Section 100.1 of the Baltimore County Zoning Regulations separates zones from districts with a zone defined as a "broad regulation of the use and manner of use of land." A "BR" zone is defined as "Business, Major." The same section states that districts are superimposed on zones and are "intended to provide greater refinement in land-use regulation." An "IM" district is one for "Industrial, Major" use.

station.  In 1989, Shell Oil sought a special exception[2] to its zoning designation to add a food mart to the service station.  On October 16, 1989, the Zoning Commissioner for Baltimore County ("Zoning Commissioner") approved the special exception, allowing a food mart to be used with the then-existing service station.

Almost two decades later, the lot was purchased, and the fuel service station was razed in 2008 so that the purchaser could install a car dealership.  On March 12, 2007, the Zoning Commissioner terminated the special exception, provided that the change would not occur until the Department of Permits and Development Management issued a permit granting a change in use for the property.

The lot is now a part of Anderson Hunt Valley, an automotive dealership that is located on the Anderson GM PUD ("GM PUD").  Developers now seek to amend the GM PUD to repurpose part of the site as a Wawa convenience store and gas station.  All parties agree that this is a material amendment to the GM PUD.

---

[2]

 As noted in *Cadem v. Nanna*, 243 Md. 536, 543 (1966),

The words "special exception" are well known in zoning law.  They refer to a grant by the zoning administrative body pursuant to the existing provisions of the zoning law and subject to certain guides and standards, of a special use permitted under the provisions of the existing zoning law. *See Heath v. Mayor and City Council of Baltimore*, 187 Md. 296, 49 A.2d 799 (1946), *see also Syosset Holding Corp. v. Schlimm*, 15 Misc.2d 10, 159 N.Y.S.2d 88 (1956), *modified* 4 A.D.2d 766, 164 N.Y.S.2d 890 (1957); *Tullo v. Millburn Township*, 54 N.J.Super. 483, 149 A.2d 620 (1959). *See* 2 Rathkopf, *The Law of Zoning and Planning*, ss 54-1 to 54-9.  Rezoning or reclassification is, of course, a change in the existing zoning law itself, so far as the subject property is concerned.  This type of change in the zoning law is governed by quite different provisions of law than those governing the granting of a special exception.

## I.      History of the GM PUD

Originally, the GM PUD consisted of two separate PUDs.  The first piece of the GM

PUD was approved by a Hearing Officer on October 31, 2003, for the purpose of

developing 10125 York Road into an automotive showroom and demonstration area for

Hummer vehicles ("Hummer PUD").  The Hummer PUD was approved pursuant to Bill

No. 47-1994 as PUD-C No. VII-796.[3]  The second piece of the GM PUD was originally

approved for development of 10111 York Road as a Honda dealership ("Honda PUD").

A Hearing Officer approved the Honda PUD as PUD-C No. VIII-848, pursuant to Bill

Nos. 19-2004 and 130-2005 on February 20, 2007.[4]  The lot that is the subject of this

appeal is located within the original Honda PUD.

### A.      Combination and Consolidation of the Hummer PUD and Honda PUD and its First Amendment

After a downturn in the economy, Anderson Automotive sought to swap the locations

of its GM dealership (located north of the Hummer PUD and Honda PUD) and Honda

dealerships, and close its Hummer dealership because of a decrease in sales of certain

automotive models.  Part of the planned changes included a new addition to the

---

[3]
      Approval of the Hummer PUD followed extensive review: a Concept Plan Conference was held on March 31, 2003; a Community Input Meeting was held on April 28, 2003; a Development Plan Conference was held on October 3, 2003; and an administrating hearing was held on October 30, 2003.

[4]
      Like the Hummer PUD, the approval of the Honda PUD came after extensive review before the Hearing Officer's decision: the County Council approved Resolution 64-06, authorizing the review of the Honda PUD by county agencies, on August 7, 2006; a Concept Plan Conference and Community Input Meeting were held; a presentation was made to the Planning Board; and the Planning Board held a public hearing on January 18, 2007.

dealership's Hummer showroom, which would extend from the Hummer PUD into the Honda PUD. A portion of the Honda PUD would be reserved for "future development." Anderson Automotive wanted to amend the Hummer PUD and Honda PUD to reflect these plans.

Developers submitted these changes as a "refinement," or a non-material amendment, to the Hummer PUD and Honda PUD. The Director of Planning Development Management approved Anderson Automotive's request on May 22, 2009. Eric Rockel ("Rockel"), President of the Greater Timonium Coordinating Council, appealed the Director's decision to the Board of Appeals, challenging whether the refinement should be classified as a material amendment (and thus, subject to the procedure for material amendments). People's Counsel for Baltimore County intervened in the dispute.

Following People's Counsel's intervention, Developers, Rockel, and People's Counsel held informal discussions to resolve the dispute. As a result of the discussions, Developers agreed to re-term the refinement as a material amendment. The parties also agreed that Developers would file a Petition for Special Hearing regarding the amendment of both the Hummer PUD and Honda PUD.[5]

As a part of the now-material amendment, Developers wanted to combine and consolidate the Hummer PUD and Honda PUD. In order to pass the amendment, a

---

[5] It appears that the parties came to this resolution among themselves, without any review by an Administrative Law Judge ("ALJ") of whether this process was or was not legally sufficient. There is also no indication of what process would have governed review of the amendment had there been no agreement among the parties to this resolution.

4

Development Plan Conference and a joint Zoning Commissioner's Hearing/Hearing Officer's Hearing was held pursuant to the Petition for Special Hearing. The order granting the consolidation of (and first amendment to) the Hummer PUD and Honda PUD was issued on January 29, 2010.[6]

### B. The Second Amendment to the GM PUD

Developers sought a second amendment to the GM PUD to place a Wawa convenience store and gas station at 10111 York Road. Developers and various Baltimore County agencies held a Development Plan Conference on January 25, 2012, to discuss the proposed amendment. Although a Development Plan Conference was held, there was no Community Input Meeting or Concept Plan Conference regarding the second amendment. Additionally, Developers did not seek a Resolution to authorize the second amendment. Developers, instead, petitioned for a special hearing regarding the amendment, just as they did with the first amendment. Developers' failure to seek a Resolution authorizing the second amendment to the GM PUD forms the basis of the present dispute.

---

[6]

This order was later revised by an order dated March 3, 2010.

**I. Administrative Appeal and Circuit Court Review**

Appellees first submitted this matter to the OAH for review. After two days of proceedings on February 17 and April 10, 2012, an ALJ issued his findings on May 15, 2012.[7] The ALJ found that Developers were not required to seek a Resolution to amend the GM PUD. The ALJ opined that Baltimore County could not insist that a new Resolution be obtained for the second amendment based on a theory of estoppel. In the alternative, the ALJ determined that the PUD is akin to a traditional development plan, and the County Code governing traditional development plans also governs PUDs. Under this theory, the amendment need only be reviewed and approved in the same manner as the original PUD. The ALJ found that because an administrative hearing[8] was all that was required for the first amendment, then it is all that was needed for the second amendment.

Appellees appealed the ALJ's decisions to the Board of Appeals, which affirmed the ALJ's opinion on September 21, 2012. The Board of Appeals agreed that the procedure for appeals that governs traditional development plans also governs PUDs. As a result, the Board of Appeals found that Developers did not need to obtain a new

---

[7] Following the hearing, on May 7, 2012, the County enacted a procedure to amend PUDs through Bill 42-12. At the time of passage of Bill 42-12, Baltimore County had no specific procedure for amending PUDs. Discussion of Bill 42-12 will follow.

[8] In the ALJ's opinion, the administrative hearing was referred to as a "Hearing Officer's Hearing." We will refer to the hearing as an "administrative hearing" here for clarity.

6

Resolution. Finally, the Board of Appeals found that the ALJ had sufficient evidence to approve the material amendment to the PUD.

Following the Board of Appeals' decision, appellants sought judicial review before the circuit court. The trial court found that the Board of Appeals "engaged in a process of reasoned elaboration in making its determination that § 32-4-262(1) controlled the instant amendment." (Internal quotation marks omitted). Based on its review of the record below, the trial court agreed with the Board of Appeals' determination and found that the Board of Appeals' decision was not erroneous. Following the trial court's review, appellants filed this timely appeal.

## Standard of Review

We will review the ALJ's decision as to both law and fact.

> In general, [a] court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.
>
> Our review of the agency's factual findings entails only an appraisal and evaluation of the agency's fact finding and not an independent decision on the evidence. This examination seeks to find the substantiality of the evidence. That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency . . . . In this context, [s]ubstantial evidence, as the test for reviewing factual findings of administrative agencies, has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]
>
> We have said, reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law. Accordingly, we may reverse an administrative decision premised on erroneous legal conclusions.

7

We are also obligated to review the agency's decision in the light most favorable to the agency, since their decisions are *prima facie* correct and carry with them the presumption of validity.

*Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 568-69 (1998) (citations and internal quotation marks omitted). "A reviewing Court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency." *E. Outdoor Advertising Co. v. Mayor and City Council of Balt.*, 128 Md. App. 494, 516 (1999) (emphasis omitted). A court should not substitute its judgment for that of the administrative agency. *Dep't of Human Res., Balt. City Dep't of Social Servs. v. Hayward*, 426 Md. 638, 650 (2012).

## Discussion

The outcome of this case depends upon which law governs material amendments to the GM PUD. In order to discern which local law controls in this case, we must review the statutes in question and determine the intent of the County Council in adopting the legislation.

> The cardinal rule of statutory construction is to ascertain and effectuate the intent of those who framed or adopted the statute. The intention of the legislature must be sought first in the actual language of the statute. A court, in determining legislative intent, must read the language of the statute in context and in relation to all of its provisions and its purpose. Furthermore, where the statutory language is plain and free from ambiguity and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself.

*Catonsville Nursing Home, Inc.*, 349 Md. at 570 (citations omitted). We will first review the legislative history of PUDs, which will inform our discussion of which local law and regulation govern the second amendment.

8

## I.   Legislative History

PUDs are a legislative creation in response "to changing patterns of land development and the demonstrated shortcomings of orthodox zoning regulations." *Rouse-Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's Cnty.*, 138 Md. App. 589, 624 (2001) (citation omitted).   As described in *Mayor and Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 540 n.15 (2002), a PUD is a "floating" zone.  This type of zoning category can be created by a petition of a property owner desiring to develop his specific tract for any special zoning purpose.  *Id.*  As explained in *Rouse-Fairwood Dev. Ltd. P'ship*, 138 Md. App. at 623-24:

> Generally, it is a zoning technique that encompasses a variety of residential uses, and ancillary commercial, and . . . industrial uses . . . .  Currently, the improvement of land is in control of developers who assemble large tracts and improve the land for resale or rental.  Given this modern pattern of land development, planners and legislators conceived a technique of land-use control which was better adapted to the realities of the marketplace . . . .  Planned unit developments make it possible to insure against conflicts in the use of land while permitting a mix of use in a single district . . . .  The PUD concept has freed the developer from the inherent limitations of the lot-by-lot approach and thereby promoted the creation of well-planned communities.

(Citations and internal quotation marks omitted).

One of the ALJ's findings was that the regulations in question were ambiguous, but, instead of examining the legislative history, the ALJ found that Baltimore County and its citizens should be estopped from insisting that a Resolution be obtained in the first instance.  We disagree with this finding and, instead, agree with the ALJ's alternate finding that the PUD is a "development plan" that should be analyzed under the PUD regulations that are a part of the Baltimore County Code.  Accepting the above, we now

9

review the legislative history adopting PUDs as a zoning technique and amending the process of approving and amending PUDs.

### A. Bill 47-94

We begin with Bill 47-94, which the County Council adopted on April 4, 1994, effective June 27, 1994. As a reference, we note that the Hummer PUD was approved pursuant to the local laws as changed by this Bill.

Bill 47-94 created PUD-Cs as an "optional planned unit development process for commercial projects" and, at the time, was added to the County's Zoning Regulations at Section 440. As enacted under Section 440.5:

> B.    Change to a use indicated in the submittal, or permitted by right or by special exception in the underlying zone or district where the use will be located, is allowed without amending the original plan if conditions of the approved PUD-C are met.
>
> C.    Change to a use not included in the submittal and not permitted by the underlying zone or district shall constitute an amendment to the PUD-C and is subject to the approval procedures specified in Division 2 of the Development Regulations for the original submittal.

Additionally, under 440.6, "[a]pproval of the PUD-C by the Hearing Officer shall constitute approval of any indicated change from the regulations of the underlying zone."

## B.  Bill 130-05[9]

Bill 130-05 revised and subsumed Bill 47-94.  As a reference, the Honda PUD was approved pursuant to the procedure adopted by Bill 130-05.  First, the Bill repealed Section 440 of the Zoning Regulations.  Second, it added Section 430, addressing "Planned Unit Developments," to the Zoning Regulations.  No provision for a change in use was provided in the new Section 430.  Third, it added Section 32-4-247 to the County Code, which allowed for a development plan review after approval of a concept plan.[10]  It also allowed that a PUD concept plan, accepted for filing prior to October 17, 2005, could use the regulations in effect at the time of filing the concept plan.

## C.      Bill 5-10

The County Council passed Bill 5-10 on January 19, 2010, effective 45 days after its enactment.  Although Bill 5-10 did make changes to the application and approval process, more importantly, at Section 5, the Bill included that "any PUD proposal for

_____

[9]

[10] The parties drew our attention to Bill 19-04 as well, but it is not relevant to our discussion.  Bill 19-04 governs submissions of new PUDs, requiring a County Council resolution to approve County review of the PUD, an informational meeting, a concept plan (and review), and a public hearing before the Planning Board.  It also allowed for a Hearing Officer's review if the decision of the Planning Board was overruled by a Resolution.  But, Bill 19-04 did not provide for amendments or changes in use of PUDs.  Because the change requiring a resolution only concerns the application process and not the amendment, we will not examine it here.

   Appellees argue that the changes to the application process are also relevant: Bill 130-05 removed the requirement of a Community Input Meeting and added the requirements of an information meeting, a concept plan, a report from the Office of Planning, and review by the Planning Board.  It also allowed a Hearing Officer to deny or approve the concept plan without any action taken by the County Council.  Because these stages are part of the application process, and not the amendment process, we do not find these changes to be outcome determinative.

11

which the County Council passed a resolution, pursuant to Section 32-4-242, prior to the effective date of this Act, may proceed under the law and Master Plan recommendations in effect at the time the resolution was passed."

### D.     Bill 42-12[11]

On May 7, 2012, the County Council adopted Bill 42-12, effective on June 18, 2012. Section 1 of Bill 42-12 requires that an amendment to an approved PUD be submitted to the Director of Permits, Approvals, and Inspections, who shall determine whether the changes are material. If he determines that an amendment is material, and the Council does not disapprove his decision (as is the case here), the PUD will be processed pursuant to Section 32-4-245 of the County Code. Section 32-4-245 requires that a Hearing Officer conduct a hearing to review the decision of the Director and either approve or deny the Director's decision.

---

[11]     The parties also alerted us to Bill 36-11 as a part of the legislative history of PUDs. The Council passed Bill 36-11 on June 6, 2011, with an effective date of July 18, 2011. Bill 36-11 imposed a new requirement for amendments previously-approved PUDs that had not yet been adopted by Resolution. The PUDs at issue, here, are well beyond the stage of effect.

## II. Governing Law

Now that the evolution of the relevant PUD regulations and laws of Baltimore County have been discussed, we must determine which of the laws controls the procedure for the second amendment. As noted by Judge Harrell in *McHale v. DCW Dutchship Island, LLC*, 415 Md. 145, 159, 161-62 (2010):

> Whether the application of a newly enacted statutory provision may be applied in a retrospective manner to given situations has proven tricky business in the appellate reports over the years. The conundrum sometimes presented by this query becomes more complex when the given situation implicates a land use or zoning context. This is so because of a somewhat anachronistic line of cases that carve out a special rule for such contexts. . . .
>
> ****
>
> In deciding that question, we stated first that "Maryland has consistently followed the rule that 'an appellate court is bound to decide a case according to existing laws, even though a judgment rightful when rendered by the court below should be reversed as a consequence.'" *Id.* (quoting *Woman's Club v. State Tax Comm'n*, 195 Md. 16, 19, 72 A.2d 742, 743 (1950)). An appellate court will apply a change in the law "after a decision below . . . unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent." *Id.* We distinguished, however, a substantive change in the law versus a procedural one, for purposes of this application. Where the change in the law during the pendency of the zoning or land use litigation works only a procedural change to the law, we will not construe that law as applying retrospectively to the case before the Court. *Id.* at 126-27, 205 A.2d at 272.[12]

The parties do not dispute that the issue is to determine what *procedure* controls a material amendment to a PUD. The ALJ found that the PUDs in this case should be treated as a typical development plan and analyzed under the laws that govern the

---

[12] For a detailed discussion of the retrospective application of statutes in the zoning context, *see McHale*, 415 Md. at 159-73.

13

amendment to them.  After reviewing the legislative history, we find no error with the ALJ's findings and conclusions.

Although we realize that there is an extensive background of both local laws and regulations, and we understand that the ALJ may have wanted to avoid the messy entanglements of delving into the many different provisions of each, it is necessary to do so in order to elucidate the reasons for which we uphold the agency's order.

To proceed, we must discern which law was in effect at the time of the approval of each PUD.  Just as with the legislative history above, we will review the laws chronologically, but unlike the legislative history, to make our discussion clearer, we will proceed in reverse order.

### A. Bill 42-12

In reviewing the plain language of Bill 42-12 and local law, we determine that the second amendment is not governed by Bill 42-12.  As noted in *Powell v. Calvert County*, 368 Md. 400, 413-14 (2002), changes in the law will apply to proceedings that take place after the change in the law becomes effective.

The second amendment was filed sometime before the Development Plan Conference on January 25, 2012,[13] and the ALJ's decision was rendered on May 15, 2012.  Bill 42-12 was passed on May 7, 2012, with an effective date 45 days later of June 26, 2012.  In other words, the proceedings had been instituted and decided before Bill 42-12 became effective.  Had the Council intended for Bill 42-12 to control the present

---

[13]     There is no indication in the record of when the second amendment was first filed to trigger the Development Plan Conference.

14

action, they could have passed Bill 42-12 as an emergency measure, effective

immediately.[14]  Bill 42-12, therefore, does not control the present appeal.

---

[14]

     The Baltimore County Charter, art. 3, sec. 308(f) allows for emergency measures:

> Effective date of laws; emergency measures.  No bill shall be passed before
> the tenth calendar day following its introduction, except by the consent of a
> majority plus one of the total number of county council members
> established by this Charter.  All public local laws and ordinances enacted by
> the county council shall take effect forty-five days after enactment, unless
> by the affirmative vote of a majority plus one of the total number of county
> council members established by this Charter any such law or ordinance
> shall be declared to be effective on an earlier or later date, or declared an
> emergency measure affecting the public health, safety or welfare, in which
> latter event the same shall take effect from the date of enactment.  The term
> "emergency measure" shall not include any measure creating or abolishing
> any office or changing the salary, term or duty of any officer, or granting
> any franchise or special privilege, or creating any vested right or interest.

**B. Bill 5-10**

Although a newly enacted statute would typically be applied to proceedings brought after its enactment, the County Council had the clear legislative intent to apply Bill 5-10 prospectively. Both the Hummer PUD and Honda PUD were passed prior to the enactment of Bill 5-10 on January 19, 2010.

Ordinarily we would apply any applicable provisions of Bill 5-10 to the proceedings before us. However, the County Council clearly intended a different result by stating that "any PUD proposal for which the County Council passed a resolution, pursuant to Section 32-4-242, prior to the effective date of this Act, may proceed under the law and Master Plan recommendations in effect at the time the resolution was passed." Because both PUDs were approved prior to the enactment of Bill 5-10, they are allowed to proceed under the law at the time they were approved, which requires us to continue to work backwards to determine the appropriate procedure for this second amendment.

**C. Bill 130-05**

It is Bill 130-05 that governs the Honda PUD portion of the GM PUD. The Honda PUD was approved on February 20, 2007, over a year after the effective date of Bill 130-05 on December 5, 2005. The County Council's intent, as reflected in Section 7 of Bill 130-05, provides that the County Council intended for this procedure to be the procedure for all concept plans accepted for filing after October 17, 2005. The Honda PUD was accepted well after and, thus, Bill 130-05 lays out the procedure that governs the Honda PUD and the appeal before us.

Although Bill 130-05 failed to specifically adopt provisions for amendments to PUDs,

16

it did adopt provisions for "Development Plan Review." Under Bill 130-05, a PUD was to be reviewed by the Department of Permits and Development Management pursuant to the newly enacted County Code Section 32-4-247, which at the time was part of the PUD title. As provided under paragraph (c), "[t]he department shall approve the development plan if it materially conforms to the concept plan as approved by the hearing officer, subject to any non-marital modifications the department may require."

We agree with the ALJ that the second amendment of the plan should "be reviewed and approved in the same manner as the original plan." Even though the ALJ did not undertake the same examination of the legislative history as we have, the ALJ correctly found that "the very same PUD Development Plan at issue in this case was amended in 2010 without the necessity of a Council Resolution, and it therefore seems perfectly reasonable that the Petitioners would believe it could be amended in a similar fashion two years later." We, now, return to the original Honda PUD's approval to determine the proper procedure for the second amendment and examine appellants' contention that the Developer needed to seek a resolution to approve the second amendment under this Bill.

Under the plain language of the PUD title at the time of the Honda PUD's approval, no approval was required for a development plan so long as it materially conformed to the concept plan that was originally approved. At the time that the Honda PUD was approved, the special exception of 1989 for the Shell Oil station was still in place. That special exception allowed for a service station and a food mart at 10111 York Road. Thus, the second amendment materially conformed with the original Honda PUD

concept plan because the land underlying the Honda PUD included a special exception to its zoning for the same use contemplated by and approved in the second amendment.

The crux of this finding rests on the initial approval of the Honda PUD's concept plan, which included the special exception for a service station and convenience mart. As the ALJ noted, the result "would obviously be otherwise if the property shown on the amended Development Plan was not included within the boundaries of the original PUD resolution, which is not the case here." Because the second amendment (and related development plan) materially conformed to the approved Honda PUD concept plan, the department was able to approve the amendment without a resolution.

Even if Developers needed to take some action for approval of the second amendment, they did more than enough to allow for public input on the second amendment. Pursuant to the request for the second amendment, Developers and various Baltimore County agencies held a Development Plan conference on January 25, 2012, to discuss the proposed amendment. Developers then petitioned for a special hearing. The matter was submitted to the OAH for review. A two-day hearing was held where testimony was taken from a variety of witnesses including Developers, engineers, and residents from the community. This allowed for community input in at least two stages before approval of the second amendment, which is more than what was required of Developers. Appellants do not seriously contend that the record lacks substantial evidence to support the agency's findings and conclusion even with some community members' opposition.

For the reasons stated above, even though the ALJ did not review the local laws and regulations, his failing did not change his factual findings and legal conclusion that

18

because an administrative hearing was all that was required for the first amendment, it was all that was needed for the second amendment.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**