*In the Matter of Cheryl Lewis, et al.*, No. 951, September Term 2023.  Opinion by Harrell, J. Filed May 30, 2024.

**ADMINISTRATIVE LAW – NUISANCE – RIGHT-TO-FARM LEGISLATION – STATUTORY INTERPRETATION – LEGISLATIVE HISTORY**

Property owners filed complaints with the Talbot County Agricultural Resolution Board alleging that a nearby farm was causing offensive odors and health concerns. The farm recently had expanded its nutrient management program from chemical fertilizers to Class A bio-solids and soil conditioners, stockpiling those materials on-site before land application on that farm and other farms in the same area that were owned or operated also by the farmer. After a hearing, the Board determined that the application and stockpiling of those materials amounted to a generally accepted agricultural practice and, thus, the farm was immune, under State Code and County ordinances regarding the right-to-farm, from the property owners' nuisance claims. The Circuit Court for Talbot County reversed the Board's decision.

**HELD:  Reversed.** The legislative history of the state's right-to-farm legislation revealed that the farm's expansion of its nutrient management program was a protected activity shielded from liability for nuisance claims. Moreover, the plain language of the relevant section of the Talbot County Code showed that the farmer's operation of his agricultural land may expand its nutrient management program without forfeiting liability protections under these circumstances.

Circuit Court for Talbot County
Case No. C-20-CV-22-000143

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 951

September Term, 2023

_____

IN THE MATTER OF
CHERYL LEWIS, ET AL.

_____

Nazarian,
Zic,
Harrell, Glenn T., Jr.
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Harrell, J.

_____

Filed: May 30, 2024

*Kehoe, Stephen, J., did not participate in the
Court's decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Although we will supplement later the background of this case, the following adaptation of the lyrics from an immediately recognizable children's song tells well the tale:

Old[1] man Foster had a farm
E-I-E-I-O
And on that farm he had a stockpile of
biosolid fertilizer
E-I-E-I-O
With some odors here
And some midges[2] there
Here a smell
There a swarm
Everywhere a nuisance.

Old man Foster had a farm
E-I-E-I-O
And his neighbors complained about
the odors and midges
E-I-E-I-O
With complaints to the Health
Department
And complaints to the Agricultural
Resolution Board
Here a complaint
There a complaint
Everywhere complaints.

Old man Foster had a farm
E-I-E-I-O
And nonetheless its operation was
approved by the Board
E-I-E-I-O
With judicial review sought by the
neighbors in the circuit court

---

[1] With apologies to the spirit and family of the late Mr. Foster, whose age we do not know as of the time he passed in 2022, we invoke nonetheless poetic license to describe him as "old" solely to facilitate faithfully the style and cadence of the context.

[2] Midges are gnat-like insect pests.

Here a reversal
There a reversal
Everywhere a reversal.

Old Mr. Foster had a farm
E-I-E-I-O
And he appealed to the Appellate Court
E-I-E-I-O
With arguments here
And arguments there
Everywhere arguments.

This appeal grew from a decision of the Talbot County Agricultural Resolution Board (the "Board"). Appellees (Cheryl Lewis, *et al.*) filed complaints with the Board about odors and swarms of midges emanating purportedly from a farm owned by the Appellants (the "Foster Farm"), located at 4084 Smiths Mill Road in Trappe, Maryland, on which organic fertilizers were stored and applied ultimately to the soil. Appellees are neighbors of the Foster Farm. After a hearing, the Board determined that "the application and stockpiling of" biosolids and soil conditioners at the Foster Farm "was a generally accepted agricultural practice[,]" and thus immune, under state and local laws, to Appellees' nuisance complaints. The Circuit Court for Talbot County reversed the Board's decision. Appellants filed timely this appeal.

## QUESTIONS PRESENTED

Appellants present three questions for our consideration, which we rephrase and reformat as follows:[3]

---

[3] Appellants phrased the questions presented as follows:

(continued…)

1.      Whether the Board erred in interpreting the right-to-farm provisions in Talbot County Code Chapter 128 and Md. Code, Cts. & Jud. Proc. § 5-403?

2.      Was there substantial evidence in the record to support the Board's decision?

3.      Did the Board provide participants with a meaningful opportunity to participate in the hearing and cross-examine witnesses?

For the reasons to be explained, we shall reverse the judgment of the circuit court and, in doing so, direct affirmance of the decision of the Board.

## BACKGROUND

Appellants are the personal representatives of the estate of Mr. Arthur L. Foster, Sr., who passed away on 31 December 2022. Appellees are property owners who reside near the Foster Farm. Mr. Foster purchased the Foster Farm on 24 March 2020. One of the Appellees, Ms. Cheryl Lewis, testified before the Board that "even though [the Foster Farm] was purchased in 2020, it was currently being farmed by an operator who had the right to farm through the end of that year." The Foster Farm consists of approximately 423.95 acres, on which corn and cover crops are grown.

---

1. Was there substantial evidence in the record to support the decision of the Talbot County Agricultural Resolution Board?

2. Did the Circuit Court err in its application of the Talbot County Right To Farm Law?

3. Did the Talbot County Agricultural Resolution Board provide participants with a meaningful opportunity to cross-examine witnesses?

3

In January 2021, Denali Water Solutions ("Denali")[4] began delivering the Foster Farm Class A biosolids[5] and soil conditioners, including "a blend of Mountaire Millsboro ('Mountaire'), Valley Proteins ('Valley') and Seawatch cake ('Seawatch')."[6]  Those materials were stored in a designated stockpile site on the Foster Farm until they were applied to the land, both on the Foster Farm and other farms in the area owned and/or operated by Appellants.

On 10 September 2021, Appellees began filing complaints with the Talbot County Office of Planning and Zoning and the Talbot County Health Department.  In those complaints, Appellees alleged that the Foster Farm was causing offensive odors and health concerns.  As a result of the complaints, Health Department officials visited the Foster Farm and confirmed the presence of "a very odorous smell being carried with the wind, coming from the direction of the farm[.]"

Two months later, Appellees filed with the Board similar complaints about the odor emanating from the Foster Farm.  The Board scheduled an evidentiary hearing for 28 February 2022, to consider the complaints.  Before the hearing, Appellants' counsel submitted a memorandum to the Board, presenting the following information:

---

[4] As noted in Appellants' counsel's memorandum to the Board in February 2022: "Denali is an organic residuals management company . . . . [Denali] collects water and wastewater residuals, as well as other food processing residuals, and converts them to soil conditioners[.]"

[5] To qualify as Class A biosolids, the biosolids must meet the pathogen elimination standards outlined in 40 C.F.R. § 503.32(a).

[6] Previously, only chemical fertilizers were used on the Foster Farm, as well as the other area farms maintained by Mr. Foster.

4

- The Class A biosolids "are certified by [the Maryland Department of the Environment ('MDE')]."

- "Ocean City received a Sewage Sludge Utilization Permit for the land application of the Biosolids from MDE on June 1, 2016, and the Permit is valid through May 31, 2026."

- "The Biosolids from Ocean City were first land applied to the Farm (as prescribed by MDE) beginning in 2021. The Biosolids are also stored at the Farm until the land application takes place."

- "Denali registers all Soil Conditioners through [the Maryland Department of Agriculture ('MDA')]."

- "The Soil Conditioners were first land applied to the Farm (as prescribed by MDA) beginning in 2021 and were all stored at the Farm beforehand."

- "The Biosolids from Ocean City and a blend of the Soil Conditioners are . . . stored at the Farm in containers called 'bunkers' until they can be land applied to the property. The [Foster] Farm does not store any soil conditioners other than those intended to be used on farms owned by the Foster family. The Soil Conditioners were primarily land applied to the fields surrounding the bunkers."

- After an investigation, a Health Department official determined that "'there has been no health or medical information provided in this case to substantiate or confirm that these odors are creating or causing a condition dangerous to health or safety.'"

After the Board hearing, Appellees filed additional complaints about swarms of flying insect pests, identified as midges. In response, Appellants' counsel submitted a memorandum to the Board, outlining three main arguments in that regard. First, "[t]here is no direct evidence that the midges are caused by the application of the soil amendment to the Farm, or from any soil amendment stored on-site." Second, "[r]egardless of the presence of midges, Mr. Foster is protected under" Talbot County Code ("TCC") § 128-1(B), which provides as follows:

5

When conducted within standard and generally accepted agricultural practices as recommended and/or legally approved by the Maryland Department of Agriculture, the United States Department of Agriculture or other state and federal agencies, neighboring property owners shall have no recourse against the inherent effects of agricultural operations. These inherent effects include, but are not limited to, . . . pests[.]

Third, there is "no dangerous health or safety condition stemming from the presence of these midges."

On 15 November 2022, the Board reconvened "to deliberate, to talk about the evidence that's been received . . . and come to a conclusion[.]" On 14 December 2022, the Board issued its written "Findings of Fact and Decision[,]" ruling as follows:

- "[T]he application and stockpiling of" the Class A biosolids and soil conditioners are generally accepted agricultural practices.

- The Class A biosolids and soil conditioners at issue are regulated by MDE and MDA, and "[t]he practices employed were in compliance with MDA's nutrient management program."

- The Foster Farm is an "agricultural land" under TCC § 128-2, which defines "agricultural land" as "land that has been used as an agricultural operation continuously for one year."

- "While there is no concrete evidence that the materials are linked to an increase in midge insects in the area, the anecdotal witness testimony suggests that there may have been a connection."

In addition, the Board recognized that Denali and the Foster Farm agreed to take steps to mitigate the odor caused by the biosolids and soil conditioners:

Denali and the Foster Farm have conceded that the Sea Watch product was particularly noxious and that deeper tilling would generally alleviate strong odors from nutrient applications in the future. They have agreed to not use the Sea Watch product on the Foster [F]arm in the future and also to utilize discing methodology when applying substances of this nature. In this respect, the Board is satisfied that this process has resulted in steps being taken to resolve the dispute between the Foster Farm and its neighbors.

6

On 14 December 2022, Appellees filed a petition for judicial review in the circuit court. After a hearing, the court determined that the agricultural operation on the Foster Farm had not been ongoing "for more than a year before [Appellees] began to complain[,]" thus, the change in the type of fertilizer being used did not qualify for the protection of the statutory scheme regarding the right to farm.

Additional facts will be included as they are relevant to the issues.

**STANDARD OF REVIEW**

"When an administrative agency's decision is before this Court, we review the agency's decision; we do not review the circuit court's decision." *J.H. v. TidalHealth Peninsula Reg'l, Inc.*, 253 Md. App. 111, 119 (2021). Our review is "limited to evaluating whether there is substantial evidence in the record as a whole to support the agency's findings and conclusions and to determining whether the administrative decision is premised upon an erroneous conclusion of law." *Brandywine Senior Living at Potomac LLC v. Paul*, 237 Md. App. 195, 210 (2018).

We review administrative agencies' factual findings for substantial evidence, which "'has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Piney Orchard Cmty. Ass'n v. Md. Dep't of Env't*, 231 Md. App. 80, 92 (2016) (quoting *Tomlinson v. BKL York LLC*, 219 Md. App. 606, 614 (2014)). When "applying the substantial evidence test" we view the decision "in the light most favorable to the agency, [because] decisions of administrative agencies are prima facie correct and

carry with them the presumption of validity." *Paul*, 237 Md. App. at 210-11 (quotation marks and citation omitted).

By contrast, "'[a]n agency decision based on regulatory and statutory interpretation is a conclusion of law.'" *Md. Dep't of Env't v. Assateague Coastal Tr.*, 484 Md. 399, 450 (2023) (quoting *Kor-Ko Ltd. v. Md. Dep't of the Env't*, 451 Md. 401, 412 (2017)). Accordingly, as to the Board's legal conclusions, our review is undertaken without deference to the agency's conclusions. *Comptroller of Md. v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 360 (2022). "When a party challenges the agency's[7] interpretation of

---

[7] TCC §§ 128-4(A)-(C) establish the Board's existence, purpose, and composition.

A. There is hereby established the Talbot County Agricultural Resolution Board ("Board"). The Board shall arbitrate and mediate disputes involving agricultural operations conducted on agricultural lands and issue findings concerning whether or not such agricultural operations are conducted in a manner consistent with generally accepted agricultural practices.

B. The Board shall be composed of five voting and two nonvoting members appointed by the Talbot County Council. . . . The Board shall convene annually to elect a Chairperson and Vice Chairperson, one of whom shall be from the agricultural community and the other of whom shall not be from the agricultural community. The Board shall establish rules of procedure, which shall be submitted to the Talbot County Council for review and approval. . . . Board members shall serve without monetary compensation. The voting members of the Board shall be composed of:

    (1) Two members from the agricultural community;
    (2) One member from the business community; and
    (3) Two members at large.

C. A representative of the University of Maryland Cooperative Extension and a member of the Talbot Soil Conservation District shall be appointed by the Talbot County Council to serve as nonvoting members of the

(continued…)

8

a statute it administers, the court must determine 'how much weight to accord that interpretation, keeping in mind that it is always within the court's prerogative to determine whether an agency's conclusions of law are correct.'" *Assateague Coastal Tr.*, 484 Md. at 451 (quoting *Md. Dep't of Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 203-04 (2019)). Applying a sliding-scale approach, "'[w]e give more weight when the interpretation resulted from a process of reasoned elaboration by the agency, when the agency has applied that interpretation consistently over time,[8] or when the interpretation

---

> Board. In any dispute, they may present facts and information and expert opinions to the Board based on generally accepted scientific research and best management agricultural practices as they pertain to a particular dispute. The Board shall consider their opinions in any final recommendations.

For more context, Md. Code, Cts. & Jud. Proc. § 5-403(e)(2) recognizes that a local agency may hear nuisance complaints brought against an agricultural operation:

> (2) If a local agency is authorized to hear a nuisance complaint against an agricultural . . . operation, a person may not bring a nuisance action against an agricultural . . . operation in any court until:
>
> (i) The person has filed a complaint with the local agency; and
> (ii) The local agency has made a decision or recommendation on the complaint.

TCC § 128-3(B) contains a parallel provision:

> Notwithstanding any provision of this section, no action alleging that an agricultural operation has interfered with the reasonable use or enjoyment of real property or personal well-being may be filed in the Circuit Court if the plaintiff has not sought and obtained a final judgment of the Talbot County Agricultural Resolution Board.

[8] We recognize that, during oral argument in this Court, Appellants' counsel conceded that, to his knowledge, this dispute caused the Board to convene for the first time in its history.

9

is the product of contested adversarial proceedings or formal rule making.'" *In re Md. Off. of People's Couns.*, 486 Md. 408, 441 (2024) (quoting *Assateague Coastal Tr.*, 484 Md. at 451-52).

In addition, statutory interpretation is a question of law that this Court reviews *de novo*. *E.g.*, *Johnson v. State*, 467 Md. 362, 371 (2020). "To ascertain the meaning of a statute, we follow the familiar rules of statutory construction." *MCB Woodberry Dev., LLC v. Council of Owners of Millrace Condo., Inc.*, 253 Md. App. 279, 305-06 (2021). As the Supreme Court of Maryland explains:

> [W]e begin with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology. When the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia. Moreover, after determining a statute is ambiguous, we consider the common meaning and effect of statutory language in light of the objectives and purpose of the statute and Legislative intent.
>
> Even in instances when the language is unambiguous, it is useful to review legislative history of the statute to confirm that interpretation and to eliminate another version of legislative intent alleged to be latent in the language.
>
> * * *
>
> In the event the language of a statute is ambiguous, we will often apply rules of statutory construction to ascertain the intent of the legislature. One such rule is to read the language of a statute in such a way that will carry out its object and purpose. This Court will also consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Blackstone v. Sharma*, 461 Md. 87, 113-14 (2018) (cleaned up).

10

**I.**

Appellants argue that the Board determined properly that an agricultural operation "ha[d] been under way for a period of 1 year or more" at the Foster Farm, and the Foster Farm was thus shielded from liability for nuisance claims under Maryland's and Talbot County's right-to-farm statute and ordinance, respectively. *See* Md. Code, Cts. & Jud. Proc. ("CJP") § 5-403(c) and TCC § 128.[9] Appellees counter that the transition to and expansive use of biosolid materials at the Foster Farm changed substantially the agricultural operation, which had used previously only chemical fertilizer. Thus, according to Appellees, the Foster Farm was not shielded from liability flowing from the one-year requirements in CJP § 5-403(c) and TCC § 128.

The current version of CJP § 5-403(c), which applies to the time of the conduct at issue in this case, provides in relevant part as follows:

> (c) *Operation continued for 1 year or more.* — If an agricultural . . . operation has been under way for a period of 1 year or more and if the operation is in compliance with applicable federal, State, and local health, environmental, zoning, and permit requirements relating to any nuisance claim and is not conducted in a negligent manner:
>
> > (1) The operation, including any sight, noise, odors, dust, or insects resulting from the operation, may not be deemed to be a public or private nuisance; and
>
> > (2) A private action may not be sustained on the grounds that the operation interferes or has interfered with the use or enjoyment of other property, whether public or private.

---

[9] This opinion is the first time a Maryland appellate court has been called upon in a reported opinion to interpret Maryland's or Talbot County's right-to-farm enactments.

CJP § 5-403(c).

The plain language of the statute is ambiguous as to whether the one-year period resets when an agricultural operation changes its methodology/approach. As a result, we must resolve this ambiguity by examining the legislative intent behind the enactment of CJP § 5-403(c). Based on the legislative history, non-negligent agricultural operations — those that are compliant with the necessary regulations and that have been under way for one year or more — are shielded from nuisance claims when expanding a nutrient management program. Indeed, as evidenced by the bill file for Senate Bill 404 (1998 Session) ("S.B. 404"), the General Assembly contemplated a case like the instant one when it repealed and re-enacted the one-year requirement for changes in agricultural operations.

Right-to-farm legislation ("RTFs") is generally a legislative response to urban sprawl, as traditional agricultural land was under pressure to convert to nonagricultural uses. *See* Margaret R. Grossman & Thomas G. Fischer*, Protecting the Right to Farm: Statutory Limits on Nuisance Actions Against the Farmer*, 1983 WIS. L. REV. 95, 97-98 (1983). RTFs were enacted in response to conflicts between new residents and agricultural operations. *Id*. All fifty states have enacted some type of RTFs, providing agricultural operations with liability protection from nuisance lawsuits under certain circumstances. *See* Rusty Rumley, *A Comparison of the General Provisions Found in Right-to-Farm Statutes*, 12 VT. J. ENV'T L. 327, 328 (2011).

In 1981, the Maryland General Assembly enacted the predecessor version of Maryland's RTFs, now codified as CJP § 5-403. *See* Acts 1981, ch. 763 § 1. The preamble to the 1981 Session Law stated as follows:

> The General Assembly finds that the protection and encouragement of agricultural operations which produce food and other agricultural products is necessary for the maintenance of the public health and welfare and the continued viability of the economy of this State and is a matter of the highest public priority.
>
> Since this State is becoming increasingly urban, farm areas and populations continue to decrease. Often when nonagricultural land uses from urban or suburban development intrude into existing agricultural areas, agricultural operations are threatened by nuisance suits.
>
> It is the purpose of this Act to reduce the loss to the State of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance[.]

*Id*. at pmbl. At that time, the statute noted that "change[s]" in the agricultural operation were subject to the following:

> If an agricultural operation, *including any change in the operation*, has been under way for a period of 1 year or more and if the operation *or the change* did not constitute a nuisance from the date the operation began *or the date the change in the operation began*, it may not be or become a public or private nuisance.

*Id*. at § 1(c) (emphasis added).

In 1998, S.B. 404 was introduced to "repeal[] the requirement that an agricultural operation had to have been in effect for at least one year in order to be protected from a public or private nuisance action[,]" i.e., the one-year requirement. S.B. 404, Fiscal Note

13

(1998 Session).[10]  Moreover, the Fiscal Note recognized that the bill was not intended to "relieve any agricultural operation from complying with applicable federal, State, and local laws or from liability due to negligence." *Id*.

The House Judiciary Committee's Bill Analysis and the Senate Judicial Proceedings Committee's Floor Report anticipated that eliminating the one-year requirement for changes in agricultural operations would allow farmers to adjust their farming operations without losing liability protection (if the operation complies with other requirements in a non-negligent manner):

> [U]nder current law, an agricultural operation or change in the operation must be under way for at least one year before the statutory protection from nuisance suits applies.  Thus, a dairy farmer who wants to switch to poultry farming would be vulnerable to a nuisance suit during the poultry farm's first

---

[10] In our evaluation of the legislative history documents referred to in this opinion, we are mindful of the principles contained in *Logan v. Dietz*, 258 Md. App. 629, 669 n.10 (2023).  Indeed, "[t]he legislative sources and documents in a bill file that are most authoritative in any given appeal will vary, depending on the issues presented[.]" *Id*.

"'General Assembly documents most likely to reflect actual legislative purpose' are 'fiscal notes, committee bill analyses, and floor reports.'" *Id*. (quoting Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: the Use and Misuse of Legislative History*, 54 Md. L. Rev. 432, 462 (1995)).  In addition, "material provided by people or organizations at committee hearings are generally advocacy statements that may have a more limited purpose[,]" but such material "is useful when it addresses controversial provisions in the legislation and thus provides insights on amendments offered during the legislative process." *Id*.

Here, we give great weight in our analysis to the House Judiciary Committee's Bill Analysis, the Senate Judicial Proceedings Committee's Floor Report, and Chair Vallario's amendment as the best indicators of the General Assembly's intent.  To be sure, the probative value of the Maryland Farm Bureau's letter to Chair Vallario is limited, at best.  It sheds light, however, on the likely origin of the relevant amendment to the bill as introduced.  The House's adoption of Chair Vallario's amendment, as outlined in this opinion, constitutes strong evidence of the General Assembly's intent to eliminate the one-year requirement for changes in otherwise compliant agricultural operations.

14

year of operation. This bill eliminates this one-year period as long as the agricultural operation conforms to applicable health and zoning requirements and is not operated in a negligent manner.

House Judiciary Committee, S.B. 404, Bill Analysis, at 2 (1998 Session); Senate Judicial Proceedings Committee, S.B. 404, Floor Report, at 2-3 (1998 Session).

The then Chair of the House Judiciary Committee, the Hon. Joseph F. Vallario, Jr., received a letter from the Maryland Farm Bureau, Inc., which supported S.B. 404 and explained the importance of repealing the one-year requirement for changes in agricultural operations:

> The elimination of the one-year exemption is critically important now as we move towards a mandated nutrient management system. Under this system, the state will ask farmers who have not previously used manure on their fields to do so to help move poultry litter out of the lower eastern shore counties and away from the Bay. Farmers who agree to help in this effort need the protection of the right to farm law immediately, not one year (and possibly several lawsuits) later.

Letter of Stephen L. Weber, President of the Maryland Farm Bureau, Inc., to Joseph F. Vallario, Jr., Chairman of the House Judiciary Committee in the legislative bill file for S.B. 404.

During the Third Reading of S.B. 404, the House adopted Chair Vallario's amendment, which accomplished two goals. First, the amendment retained generally the one-year requirement for agricultural operations, but with one exception material to the case at hand. The amendment repealed the one-year requirement for changes in agricultural operations. *Compare* Bill Text of Third Reading of S.B. 404 (1998 Session) (available at https://mgaleg.maryland.gov/1998rs/bills/sb/sb0404t.PDF) *with* Chairman

15

Vallario's Amendment to Third Reading of S.B. 404 (1998 Session) (available at https://mgaleg.maryland.gov/1998rs/amds/bil_0004/sb0404_42320101.pdf).

The enacted legislation stated as follows:

(c) *Operation continued for 1 year or more.* — If an agricultural operation has been under way for a period of 1 year or more and if the operation is in compliance with applicable federal, State, and local health, environmental, zoning, and permit requirements relating to any nuisance claim and is not conducted in a negligent manner:

(1) The operation, including any noise, odors, dust, or insects resulting from the operation, may not be deemed to be a public or private nuisance; and

(2) A private action may not be sustained on the grounds that the operation interferes or has interfered with the use or enjoyment of other property, whether public or private.

CJP § 5-403(c) (1998 Repl. Vol.). The current version of CJP § 5-403(c), applicable here, still lacks a one-year requirement as to changes in agricultural operations. When the General Assembly repealed the one-year requirement for changes in otherwise compliant agricultural operations, the General Assembly contemplated a scenario like the one at issue here: an expanded nutrient management system.

Parallel to CJP § 5-403(c), TCC §§ 128-2 and 128-3 provide a more inclusive liability shield for agricultural operations. TCC § 128-2 defines "agricultural land" as follows:

As used in this chapter, the following terms shall have the meanings indicated:

AGRICULTURAL LAND — Real property within the boundaries of Talbot County within any zoning classification that is carried on the tax rolls of the State Department of Assessments and Taxation as agricultural land and all

16

other land that has been used as an agricultural operation[11] continuously for one year.

TCC § 128-3 provides "agricultural land[s]" with a liability shield for "agricultural operation[s]" "conducted substantially in accordance with generally accepted agricultural practices":

  A. A private action may not be sustained with respect to an agricultural operation conducted on agricultural land on the grounds that the agricultural operation interferes or has interfered with the use and enjoyment of property, whether public or private, if the agricultural operation was, at the time the interference is alleged to arise, conducted substantially in accordance with generally accepted agricultural practices.

The plain language of TCC §§ 128-2 and 128-3 demonstrates that agricultural land may change the modality of its operations without losing liability protection. Indeed, TCC § 128-2 requires the "*land*" to be "used as *an* agricultural operation continuously for one

---

[11] TCC § 128-2 defines "agricultural operation[,]" in relevant part, as follows:

> The cultivation and tillage of the soil; composting; spaying; production, harvesting and processing of agricultural crops; use of irrigation and spreading of manure, lime, fertilizer, and other soil nutrients and/or improvements; raising poultry and other fowl; production of eggs; production of milk and dairy products; production of fruit, vegetables, ornamentals, and other horticultural crops; aquaculture; production of timber and any commercial agricultural procedure performed as incident to or in conjunction with such operations, including preparation for market, delivery to storage or to market. Also, the use of land for the furtherance of educational and social goals, including but not limited to 4-H clubs, Future Farmers of America (FFA), agritourism and alternative agricultural enterprises, and the like. The term also includes, but is not limited to, all matters set forth in the definition of "agricultural operation" in Courts and Judicial Proceedings Article, § 5-403(a), of the Annotated Code, as amended from time to time; and the production of all matters encompassed within the definition of "farm product" in Md. Code Ann., Agriculture Art., § 10-601(c), as amended from time to time.

year." (Emphasis added.) That regulation does not require a particular agricultural operation to exist for one year in order to enjoy liability protection. Instead, it requires the agricultural land to be used continuously for some type of agricultural operation for one year. Moreover, TCC § 128-3(A) is consistent with this interpretation, noting that the agricultural operation has liability protection "at the time the interference is alleged to arise" (if the agricultural operation was conducted on "agricultural land" and was "conducted substantially in accordance with generally accepted agricultural practices"). TCC § 128-3(A).

For these reasons, the expanded use of soil conditioners and Class A biosolids at the Foster Farm was a protected activity under CJP § 5-403(c) and TCC § 128.[12]

**II.**

Appellants argue that there was substantial evidence to support the Board's decision that an agricultural operation "ha[d] been under way for a period of 1 year or more" at the Foster Farm. CJP § 5-403(c). Moreover, Appellants contend that the Board determined properly that the storage and land application of the biosolids and soil conditioners on the

---

[12] We do not foreclose the possibility that more drastic changes in an agricultural operation could amount to a waiver of liability protection under CJP § 5-403 and TCC § 128. *Cf.* 4 Am. Law. Zoning § 33:5 (5th ed.) ("Determining when expanded operations are so substantially changed as to bar application of a right to farm requires a fact intensive inquiry."). Here, given the legislative history of CJP § 5-403(c) and the plain language of TCC § 128, the expansion of the nutrient management system on the Foster Farm did not constitute a waiver of the statutory or local code liability shields.

Foster Farm and related farms in the area was "a generally accepted agricultural practice" under TCC § 128-2.

Appellees counter that "[t]he long-term storage of materials for application at other locations is not an agricultural activity protected under [TCC §] 128[.]" Moreover, Appellees claim that "[t]he practices at the Foster Farm are not generally accepted agricultural practices because these practices violate the public health, safety, and welfare of citizens and the environment." According to Appellees, the practices at the Foster Farm violate state laws, and thus the practices are not generally accepted agricultural practices. Lastly, Appellees maintain that the Board erred in determining that there was substantial evidence that the agricultural operation had been established for at least one year.

There was substantial evidence to support the Board's decision that the storage of the biosolids and soil conditioners on the Foster Farm amounted to a protected agricultural operation under TCC § 128. TCC § 128-2 defines an agricultural operation, in relevant part, as the "spreading of manure, lime, fertilizer, and *other soil nutrients*[.]" TCC § 128-2 (emphasis added). At the Board hearing, Mr. Howard Callahan, an MDA representative, testified as follows:

> Based on my visits to the [Foster Farm] and I'll say the review of the nutrient management plan that included the products and a review of the application records of what was applied last fall and the situation at [sic] happened, nothing threw up any red flags to me out of context of what's required under the nutrient management regulations.

Also, Mr. Dwight Dotterer, an MDA representative "in charge of the nutrient management program[,]" testified that "[t]he nutrient management program allows temporary storage of manures, animal manures, class A biosolids, and stackable materials." Appellees note that

19

these materials were stored for application on the Foster Farm and other off-site farms owned or operated by Appellants. That fact does not change our analysis. The outcome is that there was substantial evidence to support the Board's decision based on the testimony of Mr. Callahan and Mr. Dotterer.

There was substantial evidence that the practices at the Foster Farm did not violate the public health, safety, and welfare of the neighbors. TCC § 128-1 includes "odors" and "pests" as inherent agricultural effects that are shielded from liability:

> When conducted within standard and generally accepted agricultural practices as recommended and/or legally approved by the [MDA] or other state and federal agencies, neighboring property owners shall have no recourse against the inherent effects of agricultural operations. These inherent effects include, but are not limited to, smoke, noise, vibration, odors, fumes, dust, pests, glare, runoff, the operation of machinery of any kind during any twenty-four-hour period (including aircraft), the use of irrigation, the storage and disposal of manure, application of fertilizer, pesticides, and other agricultural chemicals. This chapter shall not in any way restrict or impede the authority of the state or County to protect the public health, safety, or welfare.

TCC § 128-1(B). As explained previously, the Board determined properly that the "application and stockpiling of materials on the Foster Farm" were generally accepted agricultural practices. Thus, there was substantial evidence that the odors and pests were inherent effects of agricultural operations under TCC § 128-1 and, thus, not actionable bases for complaint.

There was also substantial evidence that the practices at the Foster Farm did not violate state law. To be sure, a report produced by Mr. Brian Baumgartner, an Environmental Compliance Specialist at the Maryland Department of the Environment, stated as follows:

20

Reviewing the Maryland Nutrient Management Manual, it appears all requirements are being met in regards to the [Ocean City Class A sludge ("OCCA")], with the possible exception of "Section IV. TEMPORARY FIELD STOCKPILING (STAGING) FOR STACKABLE ORGANIC NUTRIENT SOURCES[."]  It states "Any material staged in a temporary field stockpile shall be land applied in the first spring season following the placement of the stockpile."  After reviewing Ocean City's distribution logs, the OCCA was delivered from February through May 2021, prior to the spring planting period.  This would likely be a violation of this provision.

Mr. Callahan testified, however, that Appellants were in compliance with the MDA nutrient management regulations.  The Board was not obliged to credit Mr. Baumgartner's opinion more than Mr. Callahan's testimony.

Lastly, there was substantial evidence that the agricultural operation, under CJP § 5-403(c), had been under way for one year or more when the first complaints were received. On 10 September 2021, Appellees began filing complaints with the Talbot County Office of Planning and Zoning and the Talbot County Health Department.  The evidence established that Mr. Foster purchased the Foster Farm on 24 March 2020.  Indeed, one of the Appellees, Ms. Lewis, testified before the Board that "even though [the Foster Farm] was purchased in 2020, it was currently being farmed by an operator who had the right to farm through the end of that year."  Thus, there was ample evidence for the Board to conclude that the farming operation had been ongoing for more than one year.[13]

### III.

___

[13] Appellees argue that the Board "focused [incorrectly] on the length of time the operator had been in agriculture and the length of time the operator had been using the application of materials on other properties before purchasing the Foster Farm."  We disagree.  The Board noted that Mr. Foster owned the Foster Farm since 2020.  It was proper for the Board to recognize also that Mr. Foster "owned and operated a larger agricultural operation[.]"

Appellants argue that the Board provided Appellees with a meaningful opportunity to cross-examine witnesses. Appellees counter by asserting that "the Board did not ask if other complainants wanted to cross-examine witnesses." Appellees contend further that the Board erred by limiting certain individuals to five minutes of testimony and by prohibiting the introduction of evidence related to the midge swarms at the second hearing. According to Appellees, the "restriction on participation wrongfully stifled the complainants and impacted their ability to present their argument and was an error of law."

TCC § 128-5(C)(2) provides, in relevant part: "All parties involved in the complaint shall have an opportunity to present pertinent facts, be represented by counsel, examine and cross-examine witnesses, and present oral and written information to the Board. The formal rules of evidence shall not apply." Moreover, "the right of *reasonable* cross-examination attaches to adjudicatory administrative hearings." *Mayor & Council of Rockville v. Woodmont Country Club*, 348 Md. 572, 582 (1998) (emphasis added).

The Board was not required to ask whether any additional complainants wanted to cross-examine witnesses. The record demonstrates that Appellees were given a reasonable opportunity to testify and cross-examine witnesses at the February 2022 hearing when the record was still open. Indeed, Ms. Lewis cross-examined two Denali employees: Mr. Chris Banks and Mr. Jimmy Mardis. After the evidence was closed following the February 2022 hearing, the Board allowed properly the submission of additional documentary evidence from Appellees regarding the presence of midges around the Foster Farm and Appellant's reply. The Board, however, was not required to hear additional testimonial evidence about

22

the midges at the second hearing.  The purpose of the second hearing was "to deliberate in public and come to a conclusion based on the evidence that has been received."

**JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO AFFIRM THE DECISION OF THE TALBOT COUNTY AGRICULTURAL RESOLUTION BOARD.  COSTS TO BE PAID BY APPELLEES.**

23

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/0951s23cn.pdf